Kenneth **KATZ** et al., Holders of Class A Stock of General Economics Syndicate, Inc., Appellants,

v.

James **KILSHEIMER**, III, and Alexander Halpern, Trustees of General Economics Corporation and various subsidiaries under Chapter X of the Bankruptcy Act, and Donovan, Leisure, Newton & Irvine, Appellees.

No. 365, Docket 28701.

United States Court of Appeals Second Circuit.

Argued Feb. 3, 1964.

Decided Feb. 4, 1964.

**634**

Alan E. Bandler, New York City, (Jerome Gartner, Kramer, Bandler & Labaton, on the brief), for appellants Katz et al.

Francis A. Brick, Jr., New York City (Richard N. Winfield, Louis C. Lustenberger, Jr., Donovan, Leisure, Newton & Irvine, New York City, on the brief), for appellees.

Richard Bandler, New York City, for Securities & Exchange Commission.

Before MOORE, FRIENDLY and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge.

In July, 1963, General Economics Corporation (Economics) and six subsidiaries, including General Economics Syndicate, Inc. (Syndicate), filed a joint petition for reorganization under Chapter X of the Bankruptcy Act in the District Court for the Southern District of New York. Chief Judge Ryan approved the petition and appointed Kilsheimer and Halpern as trustees for all the corporations and Donovan, Leisure, Newton & Irvine as their counsel. On January 31, 1964, Katz and other holders of Class A stock of Syndicate asked this court to stay a hearing on a plan of reorganization of Syndicate proposed by the trustees which had been set for February

5, pending their appeal from an order of Judge Ryan, made on the previous day, denying their motion to disqualify Kilsheimer, Halpern and the Donovan firm from acting as trustees or as counsel for the trustees of Syndicate while acting in a similar capacity as to Economics and to direct the trustees of Syndicate to offer to rescind the sale of Class A stock. The panel sitting on that day declined to issue a stay but set the appeal for argument on February 3.

The grounds asserted for disqualifying the trustees and their counsel are as follows: Until September, 1962, Economics owned 500,000 and other persons 48,500 shares of Class B stock of Syndicate, purchased at 19¢ per share. At that time, pursuant to a registration statement filed with the SEC, a wholly owned subsidiary of Economics[1] as underwriter made a public offering of 400,000 shares of Class A stock at $10 per share. Each share, whether of Class A or Class B, has a single vote, and the two classes are voted together; however, Class A enjoys priority over Class B in other respects. The registration statement said that the funds were to be used to found wholly owned subsidiaries to engage in the business of writing life insurance in New York and California or, failing the necessary licenses in those states, to found or acquire such companies elsewhere. It also stated that the proceeds would be held in escrow until at least 200,000 shares were sold, in default of which each subscriber would receive a full refund. A report to the SEC dated November 8, 1962, stated that the offering was terminated on the preceding day, by which time 206,249 shares had been sold and net proceeds of $1,-753,583 realized.

Appellants allege that on October 30, 1962, $500,000 of the proceeds of the offering were loaned to Economics and that later additional sums were loaned to it or a wholly owned subsidiary.[2] On Decem-

---

1. This subsidiary filed for reorganization under Chapter X in April, 1963; Kilsheimer was appointed as trustee.

2. Apparently a considerable part of the later loans were repaid in cash.

ber 14, 1962, the stockholders of Syndicate were advised of the termination of the sale of Class A shares, of the grant of a license to General Economics Life Insurance Company of New York in which $750,000 had been invested, and of the denial of one to the proposed California subsidiary. The stockholders were asked to and shortly thereafter did authorize the purchase of Life Capital, Inc., allegedly "planned, organized and developed" by Economics "at a cost of approximately $150,000 in cash, plus the efforts of the General Economics management, to which no cash cost has been allocated." The price payable to Economics was $550,000 plus repayment of the $150,000, Economics applying these sums to satisfy its indebtedness to Syndicate. Appellants claim that Life Capital was nearly worthless and that the transaction simply siphoned off from Syndicate $700,000 of the proceeds of the public offering—a claim rather substantiated by the trustees' subsequent sale of all of the stock of Life Capital for $15,000.

Appellants claim that the failure of the registration statement to disclose the intended loans to Economics and the Life Capital transaction entitle them, under §§ 11 and 12 of the Securities Act of 1933, to rescind their purchases of Class A stock and to claim damages from the underwriter and Economics. They claim also that in fact fewer than 200,000 shares of Syndicate were sold, so that they are contractually entitled to a refund, and that Syndicate has a claim against Economics for the alleged looting in the Life Capital transaction. A report issued by the trustees on October 29, 1963, stated that the staff of the SEC had called these facts as to possible rights of Syndicate and of the Class A stockholders to the trustees' attention as warranting further investigation.

The same report stated that Syndicate's major asset was the stock of General Economics Life Insurance Company of New York which has net quick assets of some $610,000 but which the New

York Department of Insurance has not allowed to become active. The trustees recommended that steps be taken to establish the Life Insurance Company under ownership not connected with Economics and that one method of doing this would be the sale of the Class B shares of Syndicate stock owned by Economics, a recommendation embodied in their proposed reorganization plan.

Appellants, citing Meredith v. Thralls, 144 F.2d 473 (2 Cir. 1944), contend that Kilsheimer and Halpern and the Donovan firm are not disinterested as required by §§ 156–158 of the Bankruptcy Act since as trustees and counsel of Economics they have "an interest materially adverse to the interests of any class of creditors or stockholders" of Syndicate and of Syndicate itself. Appellees answer that the statutory prohibition does not include conflicts in fiduciary relations arising out of the very fact of appointment. The SEC, which did not file a brief, asks us not to decide that issue; it fears that a ruling broadly sustaining appellants' construction of § 158 might interfere with the scheme of § 129 permitting a subsidiary to file in its parent's Chapter X proceeding and needlessly increase administrative expense. It points out that Meredith v. Thralls, supra, could be distinguished on the ground that Thralls' conflict was not between two capacities as court appointed fiduciary but between his capacities as a court appointed fiduciary and as an employee of the Reconstruction Finance Corporation, without taking a final position whether it should be.

We can appreciate that to read § 158 (4) as meaning that any substantial assertion of a claim by a subsidiary or its security holders against the parent or with respect to the parent's claims against or interests in the subsidiary would automatically require separate trustees and counsel might cause serious additional expense in the already expensive process of reorganization under Chapter X. Although such a construction may indeed be required, we would

not wish to adopt it without more opportunity for briefing and consideration than the parties and we will have before the hearing on February 5. On the other hand, as the SEC readily agreed, it is easy to think of situations where the conflict between parent and subsidiary may be so intense and important that sound discretion would demand separate representation or, at the very least, the appointment of special counsel, cf. In re National Public Service Corporation, 68 F.2d 859, 862–863 (2 Cir. 1934), even if the statute does not make this mandatory. If we understand the facts aright, we are not at all clear that this may not be such a case. The Trustees' Report of October 29, 1963, which states that "The stock in General Economics Life Insurance Company represents General Economics Syndicate's major asset," would seem to indicate also that the value of the Class B shares of Syndicate held by Economics, a value created largely by the public offering of Class A shares, is the major asset of Economics—so that the estate of Economics has every interest in realizing on the Class B shares whereas the public security holders of Syndicate would endeavor to preserve all of Syndicate's values for themselves. It also seems plain that Syndicate and its Class A stockholders must insist that every reasonable effort be made to track down what happened to the million dollars whereby the stated proceeds of the late 1962 offering exceeded the present net quick assets of the life insurance company and the sum remaining in Syndicate's treasury, and that this effort may prove adverse in some respects to the interests of Economics. But we see nothing to be lost by an affirmance which will permit the judge to proceed with the hearing on February 5, giving leave to appellants to renew their requests at that time.[3] Many of the claims advanced on their instant motion and appeal are relevant to the proposed plan; they should have latitude to develop a full record on which the judge can take action both as to the plan and as to other issues. As Judge Ryan indicated at the hearing on January 30, such action may moot many of the issues now raised—as, for example, if he should grant leave to Class A stockholders to assert claims for rescission despite the expiration of the bar order heretofore entered, or if he should decide that the best way to realize on the value of the life insurance company would be a sale of the stock held by Syndicate rather than sale of the Class B stock in Syndicate held by Economics, or, in the event that he finds the latter course preferable, if he should decree that the proceeds of the sale of the Class B stock be held in a special account subject to any claims that Syndicate or its Class A stockholders may establish. Indeed, with some good will on all sides, the judge and the parties may work out a sensible solution that will avoid the need for a further appeal at this stage. If they cannot, we shall be able to pass on the matter with a fuller record and shall again do so on an expedited basis. If an issue as to the construction of § 158 with respect to conflicts in two court-appointed capacities remains in the case, we shall expect a definite statement of the SEC's position at that time. On this basis we affirm the order.

3. Judge Ryan should not regard himself as in any way bound by the order here under appeal or by Judge MacMahon's denial of an earlier motion for disqualification as "untenable at this preliminary stage of the proceedings."