**In the Matter of GENERAL ECONOMICS CORPORATION, G.E.C. Funding Corp., General Economics Realty, Inc., Toronto-Bayview Realty, Limited, General Economics Syndicate, Inc., Secured Financial Corporation, G.E.C. Securities of Florida, Inc.**

United States District Court
S. D. New York.
June 17, 1965.

James B. Kilsheimer, III, New York City, trustee.

Donovan, Leisure, Newton & Irvine, New York City, for the trustees, Francis A. Brick, Jr., Richard N. Winfield, and

**440**

Louis C. Lustenberger, New York City, of counsel.

David L. Marks, New York City, Sp. Counsel for General Economics Corp., its stockholders and creditors.

Nathan M. Fuchs, New York City, Atty., S. E. C.

Feuerstein & Underweiser, New York City, for General Economics Syndicate, Inc., Irwin P. Underweiser, New York City, of counsel.

Kramer, Bandler & Labaton, New York City, for certain Class "A" stockholders, Alan Bandler, and Jerome Gartner, New York City, of counsel.

Earl J. Wofsey and Robert Howard, New York City, for G.E.C., Funding Corp.

Dunnington, Bartholow & Miller, New York City, for Mrs. Patricia Hurlbert, Charles L. Stewart, New York City, of counsel.

Stanley Friedman, New York City, for Meyer and Gertrude Landsberg.

RYAN, Chief Judge.

In this consolidated reorganization proceeding under Chapter X of the Bankruptcy Act, the trustees on behalf of General Economics Syndicate, Inc. ("Syndicate") have asserted a claim of $897,209. against General Economics Corporation ("Corporation"), the parent of this corporate complex, arising out of a breach of the parent's fiduciary obligations and fraudulent acts as the controlling stockholder.[1] After a full hearing on the facts, we found the claim to be substantiated and it was allowed in the amount of $853,081.31.

The trustees now assert that the claim should be satisfied to the extent that funds are available in a special account, arising out of the sale of Corporation's stock in Syndicate pursuant to the amended plan of reorganization for Syndicate, to the exclusion of all other creditors of Corporation. The trustees' position was supported by the Securities and Exchange Commission, the reorganized Syndicate and the Class "A" stockholders of Syndicate who appeared at the hearing; opposition was asserted by the special counsel and one creditor who would have all creditors of Corporation share ratably in Corporation's assets.

Since the basic issue must be resolved by weighing the equities between Corporation, its stockholders and creditors, and Syndicate, its stockholders and creditors, the facts of the transactions in question must be examined.

Syndicate was incorporated in Delaware on February 5, 1962. Two of Syndicate's four directors were Leonard Axelrad and his brother Nelson Axelrad. The Axelrads were also two of the four directors of Corporation, its principal officers and majority stockholders.[2] Leonard Axelrad testified that he was the moving spirit who initiated the whole transaction.

Syndicate issued 548,800 shares of Class "B" common stock for 19 cents per share, and sold to the public 206,249 shares of Class "A" common stock for $10. per share. Of the Class "B" stock, 500,000 shares were sold to Corporation for a total consideration of $95,000., and the balance were sold to various insiders

1. Because of the obviously conflicting position in which the trustees and their counsel found themselves—asserting, as they did, a claim against themselves as trustees of two different corporations in the same proceeding—the trustees sought the appointment of special counsel to protect the interests of the creditors and stockholders of Corporation. After a hearing on notice to all interested parties, the Court appointed special counsel who has diligently protected the rights of Corporation, its stockholders and creditors.

cf. Katz v. Kilsheimer, 327 F.2d 633 (2 Cir. 1964).

2. In the prospectus under which Syndicate's Class "A" stock was sold to the public, it is revealed that Corporation then owned 91% of Syndicate and that Leonard and Nelson Axelrad each owned 33% of Corporation's stock. Leonard Axelrad was President and Chairman of the Board of Corporation; Nelson Axelrad was Vice-President. Secretary and Treasurer.

who assisted in the promotion of the corporate complex.[3]

Syndicate sold its Class "A" stock to the public under a Prospectus dated September 6, 1962 which stated that the proceeds of the public sale would be used to found two life insurance companies, one in New York and one in California, which would become wholly owned subsidiaries of Syndicate. The prospectus specifically asserted that Syndicate "has no present intention of engaging in any activity not connected with the insurance industry."

The public offering was completed on October 30, 1962 and on that date Syndicate received and deposited in its bank account the net proceeds amounting to $1,780,000. On the very next day, October 31, 1962, Leonard Axelrad signed a check on Syndicate payable to Corporation in the sum of $500,000. At that time Corporation had liquid assets of only $2,567.75. Thereafter, between November 26, 1962 and December 3, 1962, by four additional checks all signed by Leonard Axelrad, $200,000. more was transferred from the account of Syndicate to Corporation. Nothing in the prospectus, or in Syndicate's minute book, authorized these transfers, which totalled $700,000.

Corporation repaid a total of $150,000. so that $550,000. of the funds received from the public offering of Syndicate stock remained with Corporation. Corporation wiped out this debt by transferring to Syndicate all the capital stock of Life Capital Inc.,[4] then a wholly owned subsidiary of Corporation. Corporation caused Syndicate, on the transfer of Life Capital, to forgive the debt of $550,000., and further caused Syndicate to assume debts of Life Capital amounting to an additional $150,000. Leonard Axelrad testified that this transaction was his brainchild, and that he had "arbitrarily" fixed the price—which just happened to equal Corporation's debt to Syndicate.

At the time of the transfer, Life Capital's liabilities exceeded its assets, and it had operated at a loss in the nine months of its existence. At a Syndicate stockholder's meeting called to ratify this transaction, the true financial status of Life Capital was not revealed, nor was the fact that the payment for the Life Capital stock was to be the bookkeeping entry to wipe out the unauthorized advances already taken by Corporation.[5] Additional material facts were concealed or misstated. The vote of approval was controlled by the 500,000 shares of Class "B" stock which was owned by Corporation. Thus Corporation, whose majority stockholder "arbitrarily" fixed the price, controlled the vote of Syndicate to ratify the transaction.

We found that (1) the transfer of Life Capital was inadequate consideration for Syndicate's forgiveness of Corporation's debt, (2) Corporation breached its fiduciary duty to Syndicate in the transfer of Life Capital, and (3) Syndicate's damage by reason of the breach of fiduciary duty equals the claim as allowed in the amount of $853,081.31.

The fiduciary duty Corporation, as majority and controlling stockholder, owed to Syndicate has long been recognized, and firmly enforced. Southern Pacific Co. v. Bogert, 250 U.S. 483,

3. The Class "A" and Class "B" stock voted share for share in Syndicate. Because of their absolute control of Corporation, the Axelrads were also in a position of absolute control of Syndicate.

4. Life Capital was a form of general agency designed to promote sales of life insurance combined with mutual funds. It could not generate such sales in New York, and thus could not directly assist the only life insurance subsidiary of Syndicate, General Economics Life Insurance Company of New York.

5. From December 13, 1962 to July 3, 1963 Corporation caused Syndicate to transfer $331,000 to Life Capital and to pay an additional $9,109. for its account. Although the trustees of Syndicate were able to realize only $15,000 on the sale of Life Capital, the Court found its market value when transferred to be $37,027.69. The gross claim of Syndicate was reduced by this sum as well as by the amount of $22,100. advanced by the trustees to Life Capital prior to its sale. The claim was thus allowed at $853,081.31.

39 S.Ct. 533, 63 L.Ed. 1099 (1919); Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). In Pepper v. Litton, the Supreme Court not only spelled out the trust nature of the majority stockholder's obligation, but also established the rule that the bankruptcy trustee has the right to enforce the same. Thus the Court ruled:

"A director is a fiduciary. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, 23 L.Ed. 328. So is a dominant or controlling stockholder or group of stockholders. Southern Pacific Company v. Bogert, 250 U.S. 433, 492, 39 S.Ct. 533, 537, 63 L.Ed. 1099. Their powers are powers in trust. See Jackson v. Ludeling, 21 Wall. 616, 624, 22 L.Ed. 492. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. Geddes v. Anaconda Copper Mining Company, 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425. * * While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee." 308 U.S. at pgs. 306–307, 60 S.Ct. at pg. 245.

The breach of the duty owed by Corporation to Syndicate is manifest from the grossly excessive price "arbitrarily" fixed for the Life Capital transfer, the unauthorized transfers of hundreds of thousands of dollars out of the funds received from the public offering of Syndicate stock, the interlocking boards of directors of the two companies, both firmly under Axelrad's control, the improper, inadequate and misleading disclosures at the stockholder's meeting, and the personal benefits derived by the Axelrads by virtue of their majority interests in Corporation. All this was accomplished at the expense of Syndicate and its Class "A" stockholders.

In the amended plan of reorganization for Syndicate, which has been approved by the parties affected and confirmed by the Court, the trustees on behalf of Corporation sold the 500,000 shares of Syndicate Class "B" stock for a price of $200,000.[6]

The report of the trustees, which was approved by the Court and accompanied the plan when it was sent to the interested parties, after reciting the background of the trustees' claim against Corporation, reported:

"On the basis of the facts outlined above and the financial statements annexed hereto with respect to Corporation's dealings with Syndicate, the Trustees are constrained to assert a claim in the amount of $897,209. on behalf of Syndicate against Corporation. If allowed by the Court, this claim will be paid to the Reorganized Company under terms and conditions approved by

6. The sale was pursuant to Article III A of the plan which reads as follows:
"The Trustees on behalf of General Economics Corporation shall sell and Louis Beryl shall buy the Class B Common Stock of the Debtor now held by General Economics Corporation consisting of 500,000 shares for an agreed total purchase price of $200,000.00. The proceeds of such sale shall be held in a Special Account by the Trustees subject to the further order of the Court, and subject to such determinations as may be made with respect to the payment of any claims of the Debtor or Class A stockholders of the Debtor. Such sale is in accordance with the order of the Court dated October 29, 1963 and the notice to all stockholders and creditors of General Economics Corporation, inter alia, mailed and published pursuant to the said order, and shall be effective only upon the approval of the Court. A copy of the Agreement of sale is made a part hereof, annexed hereto, and is incorporated in this Plan as Exhibit I."

the Court, in part from the Special Account derived from the sale of the 500,000 shares of Class B common stock of Syndicate held by Corporation, as provided in Sections II and III(A) of the plan. With respect to satisfaction of the balance of the claim if allowed by the Court, reference is made to Section II of the plan which enables the Trustees with Court approval to prosecute actions against the former management of Syndicate.[7]

■ It is the $200,000 realized from the sale of the Class "B" shares, now held in a special account, which the trustees urge should be utilized to satisfy in part Syndicate's claim. We hold that the trustees' position is correct.

Undoubtedly under Bankruptcy Act, § 216 (11 U.S.C. § 616) the plan of reorganization could have included "in respect to stockholders generally or some class of them, provisions altering or modifying their rights, either through the issuance of new securities of any character *or otherwise*." In fact the Syndicate plan did provide for the cancellation of outstanding warrants to purchase Class "A" stock.

Because the basic equity in syndicate at the date of filing its reorganization petition was clearly in the Class "A" stockholders, the plan could have cancelled the outstanding Class "B" stock and provided for the issue to the investor who was to finance the plan of a new class of common stock which carried the same rights, privileges, obligations and prerogatives of the old Class "B" stock. In order not to delay the formulation of the plan and its consummation—with the attendant activation of Syndicate's hitherto relatively inactive life insurance company subsidiary—the trustees chose to use the existing Class "B" stock as the vehicle to vest control of Syndicate in the new investor. They preserved, however, their rights against Corporation and its Class "B" stock by Article III

A of the plan. In effect we hold that the rights which the trustees had under Bankruptcy Act, § 216 with relation to Corporation's Class "B" stock were continued in the plan and merely transferred from the shares themselves to the proceeds realized for the shares.

■ The Supreme Court in enunciating the so-called Deep Rock doctrine in Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939) referred to the

> "equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice. This principle has been applied in appropriate circumstances to give minority stockholders redress against wrongful injury to their interests by a majority stockholder." (at pg. 322, 59 S.Ct. at pg. 550).

The Deep Rock doctrine makes clear the right, and indeed the obligation, of this reorganization court, as a court of equity, to weigh the equities between Corporation and Syndicate, its wronged subsidiary. If appropriate under all the circumstances we must give the subsidiary, or its shareholders, rights superior to the parent in assets to which the subsidiary has rightful claim. This is singularly applicable to situations, such as here, where the parent or majority stockholder has consciously mismanaged the subsidiary. In speaking of the Deep Rock rule in Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, the Supreme Court said of the doctrine laid down in Taylor v. Standard Gas & Electric Co., supra:

> "This was based on the equities of the case—the history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary by Standard to the detriment of the public investors." 308 U.S. at 308, 60 S.Ct. at 246.

---

**7.** The stockholders and creditors of both Corporation and Syndicate were given notice of this proposed action.

The foregoing is an apt description of the corporate plunder carried on by Corporation at the expense of Syndicate and the funds invested by its public stockholders. No justification has been shown, or even suggested, for the brazen double dealing with funds entrusted to Syndicate, and we find none. The equities of this situation lie all with Syndicate. Under both the Bankruptcy Act and as a court of equity, we are constrained to rule that Syndicate is entitled to the funds generated under the plan of reorganization from the sale of the Class "B" shares. No injustice is thereby done to Corporation or its creditors because Syndicate as the victim of Corporation's flagrant breach of its fiduciary duties and fraudulent acts must have rights superior to those claiming through Corporation, the wrongdoer.

The funds in question here were created by Syndicate in its plan of reorganization. Certainly the creditors and stockholders of Syndicate are equitably entitled to the benefits of its plan before all others. The Class "B" shares held by Corporation had no value except such as was created by the Syndicate plan. The creditors of Corporation are in no position to profit from that plan.

The result here ordered was envisioned by the Court of Appeals in Katz v. Kilsheimer, 327 F.2d 633 (2 Cir., 1964), when it was called upon to consider the status of the intercorporate claims to be asserted by the trustees. The question was raised in the context of the propriety of one set of trustees for both Corporation and Syndicate. The Court then noted that the issue there raised might be mooted if we "should decide that the best way to realize on the value of the life insurance company would be a sale of the stock held by Syndicate rather than sale of the Class B stock in Syndicate held by Economics, or, *in the event that he finds the latter course preferable, if he should decree that the proceeds of the sale of the Class B stock be held in a special account subject to any claims that Syndicate or its Class A stockholders may establish*." 327 F.2d at pg. 636.

Claims of Class "A" stockholders have been allowed in the total amount of $2,568.58. They shall be paid in full from the special account. The balance of the special account, subject to the allowance to be hereafter made to special counsel shall be paid to Syndicate in partial satisfaction of its claim. The trustees suggest that the special account should bear its share of further administration expenses attributable to it. The Court prefers not to assess specific fees or allowances to the special account, but will consider all services of those entitled to allowance in the Syndicate proceeding, including those concerned with the special account, at a hearing on final allowances. We suggest that such hearing be brought on promptly, and with that in mind the trustees shall defer payment of the balance of the special account pending the final allowances, or further order of the Court.

The reorganized company has, with the concurrence of the S. E. C. suggested certain amendments to the Syndicate charter to give some additional rights to Class "A" stockholders in the event of liquidation by reason of the receipt of the proceeds of the special account. The substance of the amendment as proposed gives Class "A" stockholders greater rights than they otherwise would have had, and it is found to be fair and equitable.

Specific orders shall be settled on five days notice providing for the payment of the claims of Class "A" stockholders totalling $2,568.58 from the special account, and authorizing and approving the proposed amendment of the Syndicate charter. As to the balance, this opinion shall constitute the order of the Court.