360 F.2d 762
 In the Matter of GENERAL ECONOMICS CORPORATION, G.E.C.
Funding Corp., General Economics Realty, Inc.,
Toronto-Bayview Realty Limited, General Economics Syndicate,
Inc., Secured Financial Corporation, G.E.C. Securities of
Florida, Inc., Debtors, The Reorganized Company, General
Economics Syndicate, Inc., Appellant.
 No. 294, Docket 30180.
 United States Court of Appeals Second Circuit.
 Argued March 29, 1966.
Decided May 24, 1966.
 
 Peter D. Fischbein, New York City (Irwin P. Underweiser, Bernard A. Feuerstein, and Feuerstein & Underweiser, New York City, with him on the brief), for appellant General Economics Syndicate, inc.
 Alan Bankler, New York City (Jerome Gartner and Kramer, Bandler & Labaton, New York City, with him on the brief), for appellants Jerome Gartner and Kramer, Bandler & Labaton.
 Francis A. Brick, Jr., New York City (Louis C. Lustenberger, Jr., and Donovan Leisure, Newton & Irvine, New York City, with him on the brief), for appellees James B. Kilsheimer, III, Alexander Halpern, and Donovan, Leisure, Newton & Irvine.
 Richard V. Bandler, Asst. Regional Admr. (Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Sol., Barbara Lee and Richard E. Nathan, Attys., S.E.C., with him on the brief), for Securities and Exchange Commission.
 Before MOORE, FRIENDLY and ANDERSON, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 These are appeals from an order of the District Court granting ginal allowances for services rendered in a corporate reorganization proceeding under Chapter X of the Bankruptcy Act, 11 U.S.C. 501 et seq.
 
 
 2
 A brief description of the debtor's problems and the history of the reorganization is essential to an appraisal of the fairness of the allowances under review. General Economics Corporation (Economics) formed the debtor, General Economics Syndicate (Syndicate), in February 1962, to engage in the life insurance business as a holding company. Economics took 500,000 of the 548,000 shares of Class B Common Stock at a cost of 19 cents per share. In October 1962, Syndicate issued roughly 200,000 shares of Class A Common Stock to the public at $10 per share. Most of the proceeds of this offering were appropriated by Economics, which borrowed $700,000 from Syndicate and then caused Syndicate to forgive the loan in return for a worthless Economics subsidiary, Life Capital Inc., which Economics transferred to Syndicate.
 
 
 3
 Economics, Syndicate and five whollyowned subsidiaries of Economics filed a voluntary joint petition for reorganization on July 17, 1963. On the same day, the District Court approved the petition, appointed James B. Kilsheimer, III and Alexander Halpern trustees for all the debtor corporations, and named the firm of Donovan, Leisure, Newton & Irvine as counsel to the trustees. At this time, Syndicate had in its own name net assets of approximately $103,000 and owned all the stock of Life Capital, Inc., which was virtually worthless, and of General Economics Life Insurance Company of New York (General Economics Life), which had net current assets of roughly $610,000 and a license to sell insurance in New York. The New York State Department of Insurance had not yet approved the policies and forms of General Economics Life, apparently because of concern over its relatively small assets. General Economics Life sold no policies but did some reinsurance business.
 
 
 4
 The Trustees submitted a proposed plan of reorganization on January 7, 1964. As amended, the plan was approved on March 24, 1964. The purpose of the plan was to transfer control of Syndicate to a reputable businessman familiar with the insurance business and to infuse into the reorganized company enough funds so that General Economics Life could start functioning. The plan provided that control of Syndicate would be transferred to a new investor through the sale of Syndicate Class B stock owned by Economics; that the new investor would purchase new 'Callable Preferred' of Syndicate at $100 a share; and that the new investor would also purchase up to 83,000 shares of Class A stock at $2.50 a share.
 
 
 5
 A public sale was held on March 24, 1965, at which Louis Beryl was the successful bidder. He agreed to invest $600,000 of new capital in the reorganized company by purchasing 6,000 shares of the new callable preferred; to purchase control of Syndicate by buying the 500,000 shares of Class B for $200,000; and to buy up to 83,000 shares of Class A at $2.50 a share. Before Beryl's investment, Syndicate's total assets were practically the same size as they had been at the time of the filing of the petition.
 
 
 6
 The closing of the sale took place on December 11, 1964, after the New York State Department of Insurance had approved Beryl and the capitalization of the companies.
 
 
 7
 The $200,000 paid for the 500,000 shares of Class B stock was placed in a special account, pending determination of a claim by Syndicate's trustees against Economics for breach of fiduciary obligations. On May 26, 1965, the District Court gave judgment on the claim in the amount of $853,081.31. On June 17, 1965, the Court held, 242 F.Supp. 439, that Syndicate should receive the $200,000 in the special fund, on account of the judgment for breach of fiduciary obligations.
 
 
 8
 On September 13, 1965, a hearing was held to determine the amount of final allowances. By order dated September 15th, the Court granted final allowances and disbursements totalling $160,500, of which $100,000 was awarded to the Donovan firm; $31,000 to trustee Kilsheimer; $16,000 to trustee Halpern; and $3,500 to Jerome Gartner and Kramer, Bandler & Labaton, who jointly represented certain Class A shareholders in Syndicate. The Donovan firm had requested $125,000; Kilsheimer $42,500; Halpern $30,000; Gartner and the Kramer firm $25,000. The SEC recommended awards as follows: the Donovan firm $75,000; Kilsheimer $25,000; Halpern $10,000; Gartner and the Kramer firm $15,000.
 
 
 9
 On these appeals, the Donovan firm and the trustees defend the propriety of the awards; the SEC contends that the awards to the Donovan firm and to the trustees were excessive, and the award to Gartner and the Kramer firm too small; the reorganized company attacks the awards to the Donovan firm and the trustees as excessive; and Gartner and the Kramer firm urge that the award to them was too low.
 
 
 10
 1. The Awards to the Donovan Firm and to the Trustees.
 
 
 11
 The reorganized company contends that the administration expenses should have been paid entirely out of the assets held by Syndicate in its own name-- some $94,000-- immediately before th closing of December 11, 1964, on the theory that the new money pumped in by Beryl should not be subject to liability for administration expenses. We do not find this argument persuasive. The purpose of the reorganization was to achieve a sale to someone like Beryl, and to ge new money into the corporation. Much of the work done was for the benefit of the eventual purchaser. Most important, I(A) of the plan for reorganization expressly provided that:
 
 
 12
 'All costs and expenses of administration and other allowances which may be made be the Court in this proceeding shall be paid in cash by the Trustees out of the assets in their hands or by the Reorganized Company, as the Court shall direct.'
 
 
 13
 However, we agree with the reorganized company and the SEC that the allowances to the trustees and to their counsel were too high. We recognize that the trial court 'was familiar, as we are not, with the actual work done and therefore far better able to appraise it than we can from mere study of the paper record. * * *' In Re Realty Associates Securities Corp., 156 F.2d 480, 483 (2d Cir. 1946). We are reluctant to disturb the conclusion of the trial court. However, the administration of the estate was not a matter of enormous complexity. There was no business to run. The principal tasks were to draft a plan of reorganization; to keep the stockholders informed; to find a good buyer for the company; to make sure that the buyer was approved by the state insurance authorities; and to bring suit against the parent, Economics, for a fairly clear breach of fiduciary obligations.
 
 
 14
 The Donovan firm estimates that it spent 3,620 hours on the debtor's affairs. Only 650 of these hours were spent by a member of the firm; some of the hours appear to have been spent in clerical work such as mailings to stockholders; and both the numbers of hours claimed and the accompanying affidavit indicate that a substantial portion of this time was spent on ordinary business matters that were also handled or could have been handled by the trustees. See Finn v. Childs Co., 181 F.2d 431, 436 (2d Cir. 1950); London v. Snyder, 163 F.2d 621, 626 (8th Cir. 1947).
 
 
 15
 Moreover, the time records submitted by the Donovan firm were of a fragmentary nature. The senior partner apparently did not keep time records, and the time records kept by the associates are not broken down as between the different debtors in the General Economics complex of companies, all seven of which were undergoing reorganization. This court has previously warned the bar that:
 
 
 16
 'any attorney who hopes to obtain an allowance from the court should keep accurate and current records of work done and time spent. Lawyers are well aware that, especially where services of the nature here involved are spread over a period of time and ultimate payment is virtually assured, they are valued principally on the basis of the time required.'
 
 
 17
 In re Hudson & Manhattan R.R., 339 F.2d 114, 115 (2d Cir. 1964); In re Wal-Feld, 345 F.2d 676, 677 (2d Cir. 1965). The records of the Donovan firm do not comport with these standards.
 
 
 18
 In addition, the records of the trustees, both of whom are attorneys, are not as detailed as they could be. Their affidavits set forth the nature of the work done without attempting any breakdown as between the different debtors undergoing reorganization.
 
 
 19
 Under all these circumstances, we believe that the allowances to the trustees and their counsel should be reduced to $75,000 for the Donovan firm; $25,000 for Trustee Kilsheimer; and $10,000 for Trustee Halpern. These figures correspond to the recommendations of the SEC, which are entitled to respect and consideration. Finn v. Childs, 181 F.2d 431, 437-438 (2d Cir. 1950); see Surface Transit Inc. v. Saxe, Bacon & O'Shea, 266 F.2d 862, 865 (2d Cir. 1959); Scribner & Miller v. Conway, 238 F.2d 905, 907 (2d Cir. 1956).
 
 
 20
 2. The Awards to Gartner and to the Kramer Firm.
 
 
 21
 We believe further that the allowances to Jerome Gartner and the firm of Kramer, Bandler & Labaton should be increased. Study of the record convinces us that their efforts, as attorneys for certain Class A shareholders in Syndicate were in part-- even though indirectly-- responsible for the increase in the estate of Syndicate which resulted from the assertion of Syndicate's claim against Economics and the turning over to Syndicate of the $200,000 proceeds of the sale of Syndicate Class B, which had been owned by Economics, to Syndicate.
 
 
 22
 The trustees' original plan had proposed the sale of the Class B Syndicate stock owned by Economics without any mention of the creation of a special fund to hold the proceeds pending the assertion by Syndicate of its claims against Economics. Gartner and the Kramer firm then moved to dismiss the trustees on the grounds of conflict of interest between their position as trustees for Economics and as trustees for Syndicate, in light of Syndicate's claim against Economics for breach of fiduciary obligations. On appeal from the denial of this motion, this court suggested that the apparent conflict of interest might be resolved in a number of ways, including the creation of a special account for the proceeds of the sale of the Class B stock, subject to any claims that Syndicate or the Class A shareholders might establish. Katz v. Kilsheimer, 327 F.2d 633, 636 (2d Cir. 1964). This suggestion was eventually adopted in the amended plan of reorganization. As we have seen, Syndicate's claim against Economics was eventually upheld, and the proceeds of the sale of the Class B stock paid to Syndicate.
 
 
 23
 Gartner and the Kramer firm helped to bring about this result. Even though the trustees had shown their awareness of a possible breach by Economics of its fiduciary obligations to Syndicate as early as October 29, 1963 in a report to shareholders, they had made no concrete suggestions as to how Syndicate might protect a right of recovery for that breach. But it must be said that the mechanism ultimately adopted-- the setting up of a special account-- was only indirectly the result of the efforts of Gartner and the Kramer firm, who throughout the reorganization urged liquidation and distribution of most of the proceeds to the Class A shareholders. Furthermore, at least part of the Gartner-Kramer investigation into the claim of breach of fiduciary obligation merely duplicated work already done and reported to the shareholders by the trustees.
 
 
 24
 We conclude that while the trial court's allowance of $3,500 did not adequately reflect the value of the efforts of Gartner and the Kramer firm, their request for $25,000 and the SEC recommendation of $15,000 are excessive. We believe that an award of $10,000 fairly reflects the value of benefits to the plan of reorganization and to the estate of the efforts of Gartner and the Kramer firm.
 
 
 25
 The order of the district court is modified in accordance with this opinion and, as modified, affirmed.