**In the Matter of NAZARETH FAIRGROUNDS & FARMERS MARKET, INC., Debtor.**

**No. 89669.**

United States District Court
S. D. New York.
Aug. 25, 1966.

---

———◆———

Alex L. Rosen, New York City, pro se.

Charles Seligson, New York City, pro se.

Melvin Lloyd Robbins, New York City, pro se and as attorney for Irving J. Wolf and others.

Arnold A. Weinstein, New York City, pro se.

Harper & Matthews, New York City, for Jerome Fried and Nazareth Enterprises, Inc.; Vincent P. Uihlein, New York City, of counsel.

SUGARMAN, District Judge.

Alex L. Rosen, (hereinafter Rosen) attorney for the debtor and debtor-in-possession, Nazareth Fairgrounds and Farmers Market, Inc., (hereinafter Debtor), Melvin Lloyd Robbins, (hereinafter Robbins) attorney for certain stockholders of the debtor, Gilbert Sunshine, (hereinafter Sunshine) accountant for the debtor and Charles Seligson, (hereinafter Examiner) has each presented an application for compensation and reimbursement of expenses, pursuant to an order filed on July 28, 1965 confirming a plan of reorganization for the debtor.

### Rosen's Application

Rosen has applied for compensation of $150,000 and reimbursement of expenses of $724.54. On September 28, 1953 Judge Alexander Holtzoff, then sitting in this district, made and entered an order which provided, *inter alia*:

"ORDERED, that Nazareth Fairgrounds and Farmers Market, Inc., debtor in possession be and it hereby is authorized to employ and appoint ALEX L. ROSEN, ESQ. to represent it as attorney and counselor in this and all other proceedings and actions."

The order originally submitted to Judge Holtzoff provided that Rosen be retained to represent the debtor "as attorney and counsellor in this proceeding under a general retainer." Judge Holtzoff. denied that request by limiting Rosen's employment as debtor's attorney to "this and all other proceedings and actions." Since that date, Rosen has acted as attorney for the debtor.

Rosen's application lists various areas in which he rendered services for which compensation is sought. Those areas include: (A) The claims of Benjamin Margolis, Ida Mae Margolis, William McK. Shongut, Sarah Kason and Bernard L. Ungar, (hereinafter the Margolis group); (B) condemnation of real property of the debtor by the Commonwealth of Pennsylvania; (C) settlement of insurance claims of the debtor as a result of two fire losses; (D) proceedings with respect to the allowance and disallowance of stock claims; (E) proceedings with respect to the allowance and disallowance of general creditor claims; (F) leases entered into by the debtor; and (G) plan of reorganization for the debtor.

### (A) The claims of the Margolis group.

The Margolis group filed the following claims in the reorganization proceeding:

*Benjamin Margolis*

*February 9, 1955*—judgment creditor—$3,600 based on debtor's confession of judgment (refiled February 28, 1955);

*February 9, 1955*—creditor—$25,-000 representing his costs and expenses in connection with § 21a examinations of Margolis conducted by the debtor;

*February 28, 1955*—stock claim—17 shares of the debtor's stock.

*Ida Mae Margolis*

*February 9, 1955*—creditor—$3,550 representing balance due on a loan; *February 28, 1955*—stock claim—15 shares of the debtor's stock.

*William McK. Shongut*

*February 21, 1955*—judgment creditor—$10,003.76, based on debtor's confession of judgment; *February 21, 1955*—stock claim—10 shares of the debtor's stock.

*Sarah Kason*

*February 28, 1955*—stock claim—10 shares of the debtor's stock.

*Bernard L. Ungar*

*February 28, 1955*—stock claim—2 shares of the debtor's stock.

In October, 1953 Rosen, as attorney for the debtor, commenced examinations of the Margolis group pursuant to § 21a of the Bankruptcy Act. Following examinations and a trial before Referee Joyce, a petition to review before the District Court, and an appeal to the Court of Appeals (Margolis v. Nazareth Fair Grounds & Farmers Market, Inc., 2 Cir., 249 F.2d 221), the Referee's order of October 11, 1956 voiding the judgments was ultimately sustained.

The stock claims of the Margolis group were also tried before Referee Joyce and on August 30, 1957 he disallowed them. Thereafter, after another proceeding before this court, dealing with 36 other stock claims, that was finally terminated in the Court of Appeals, the stock claims of the Margolis group were determined *sua sponte* by the Court of Appeals in accordance with the principles enunciated by that court in that other proceeding. (Fried v. Margolis, 2 Cir., 296 F.2d 670, at 676.) On that basis, of the 54 shares of stock claimed by the Margolis group, 15.287 were ultimately allowed and 38.-713 were disallowed.

The creditor claims of Benjamin Margolis and Ida Mae Margolis, referred to above, will be discussed hereinafter.

Rosen's application for an allowance states that he, as attorney for the debtor, spent in excess of 1,300 hours in countering the various claims of the Margolis group. Based on Rosen's application for $150,000 for 6,138 hours in services claimed to have been rendered to the debtor, his requested fee for his activities in respect of the Margolis group approximates $32,000.

Ignoring that the allowance of stock claims to the Margolis group came about as an adjunct to the resolution of other stock claims, and giving Rosen sole credit for reducing the stock ultimately issued to the Margolis group, Rosen asks about $32,000 for increasing the value of stock ultimately issued to all recognized stockholders by approximately $39,000 and reducing the creditors' claims against the debtor by about $42,000 including the obviously unsupportable Margolis $25,-000 creditor claim.

(B) *Condemnation of real property of the debtor by the Commonwealth of Pennsylvania.*

Prior to the filing of the reorganization petition, the Commonwealth of Pennsylvania condemned a portion of the real property owned by the debtor in Nazareth, Pennsylvania, for highway improvement purposes.

The debtor applied for an order appointing an appraiser to ascertain the value of the condemned real property and the court appointed J. M. Brandau, of Easton, Pennsylvania, as such appraiser who reported that the value of said property was $20,000. The Commonwealth offered $3,000 for the property, which was rejected by the debtor's Board of Directors.

On April 21, 1955 the debtor moved before Referee Joyce for judgment against the Commonwealth for $20,000 by way of set-off and counterclaim to the said Commonwealth's claim for taxes allegedly owed by the debtor. On August 22, 1955 the Commonwealth moved to dismiss the set-off and counterclaim for lack of jurisdiction.

Thereafter, the debtor's president, Arnold A. Weinstein, (hereinafter Weinstein) and Rosen had two conferences with representatives of the Common-

wealth, following which the offer of the Commonwealth was raised to $8,000, if the set-off and counterclaim of the debtor were withdrawn. On Weinstein's petition that the "best interests of the debtor will be * * * served" by acceptance of the offer, the debtor was granted leave to compromise its claim against the Commonwealth for $8,000.

(C) *Settlement of insurance claims of the debtor as a result of two fire losses.*

On August 28, 1956 improvements on the debtor's real property were severely damaged by fire. On September 7, 1956 Weinstein, as debtor's president, petitioned this court for leave to retain Young Adjustment Company of Philadelphia, Pennsylvania, to adjust its claims against various insurance companies arising out of said fire, explaining

"that such retention is necessary and desirable for the reason that the loss described is a large one which presents complicated questions which can best be resolved through the agency of a fire insurance adjuster * * *."

Accordingly on September 12, 1956 it was

"ORDERED, that * * * Debtor, be and it hereby is authorized to retain Young Adjustment Company and to pay [it] a sum not to exceed 10 per cent of the moneys collected by [it] for its services and expenses as the fire adjuster herein."

Pursuant to an order filed on November 7, 1956 on recommendation of Weinstein, as debtor's president, the claim was settled for $115,206.78.

On April 20, 1957 the debtor was also authorized to accept an offer of $28,100.15 made by the insurance companies for rent loss claims arising out of the fire.

Young Adjustment Company received fees of approximately $13,000 for its services in negotiating the settlement of the insurance claims of the debtor as a result of the fire of August, 1956.

On May 13, 1962 a portion of the grandstand building owned by the debtor was damaged by fire. On May 24, 1962, Alvin H. Butz, a general contractor, submitted an estimate of the cost to repair the damage at $13,913.19. The total cost to repair the damage was estimated by the debtor at $15,479.30, including electrical work, not covered by Butz's estimate. The said estimate received from Butz dated May 24, 1962 and his supplemental letter dated June 19, 1962 were addressed to "Nazareth Fairgrounds and Farmers Market, Inc. Attention: Mr. Jerry Fried, Mgr."

On May 31, 1962 the debtor, by Weinstein, its president, petitioned for authority to accept an offer of $13,913.19 from the insurance companies and stated that the offer was based upon Butz's estimate and was " * * * fair and reasonable and in the best interests of the debtor" whereupon, on June 6, 1962 at a hearing on the debtor's said petition of May 31, 1962, Rosen stated:

"May I say this to your Honor, that we were able to make a favorable settlement, *as I was given to understand*." (emphasis supplied) (SM 13491)

At the hearing on June 6, 1962, when the Examiner asked if any brokerage or other fees were payable from the $13,913.19 offer the following colloquy took place:

"*MR. WEINSTEIN*: I can answer that question. There are no fees payable at all.

*MR. FRIED*: I would like to correct that, your Honor, if I may.

THE COURT: Surely.

*MR. FRIED*: There may be a fee. Mr. Butz submitted his figures and in a letter to us he stated that in the event he gets the repair job then there is no fee; if he doesn't get the repair job then the fee *for making up this job as you have it is $300.* That's the extent of the expenses." (emphasis supplied) (SM 13493–4)

On July 12, 1962 the debtor was authorized to accept the $13,913.19 offer.

Nothing in the record sustains Rosen's claim for compensation for having "conferred and having helped negotiate the settlement with the insurance company and said loss [sic] in conjunction with

one Butz and did the necessary legal work to retain the necessary parties, *such as an appraiser, fire loss adjuster.* * * " (emphasis supplied).

(D) *The proceedings with respect to the allowance and disallowance of stock claims.*

Forty-one proofs of stock interest were filed in this proceeding—five by the Margolis group and thirty-six by others. Rosen, as attorney for the debtor, filed objections and counterclaims for subscription prices to every stock claim filed, but the counterclaims were never pressed by the debtor.

Although in 1954, Rosen, as attorney for the debtor, sent a questionnaire to each stock claimant requesting information as to each claimant's acquisition of stock, between September, 1953 and May, 1958 Rosen conducted intermittent examinations of only "8 or 10" of the stock claimants pursuant to § 21a of the Bankruptcy Act, (SM 2162) contenting himself with the answers to the questionnaires as adequate preparation for trial.

By petition dated February 28, 1958, the debtor sought leave to compromise the stock claims on a formula worked out by Rosen and Weinstein. It was denied because it lacked substantial facts as to the basis of each claim which, in the absence of § 21a examinations, only a trial could reveal.

During the trial of the stock claims, the wisdom of the rejection of the earlier proposed compromise was acknowledged by Rosen thus: "at this stage of the game. * * * I might well agree with you in view of developments." (SM 2307)

Rosen attended and participated in the stock claim hearings held before the court on approximately 86 separate days between May 19, 1958 and May 7, 1959. Rosen, as attorney for the debtor, which was bound to act as a trustee under § 188 of the Bankruptcy Act, owed the duty to assist in aiding the court in resolving the complex problems as to the stock ownership in the debtor. Despite this obligation, Rosen objected to every reference to personal conversations had with John Malakoff the person from whom every claimant ultimately traced his claim to shares of the debtor's stock. (SM 547 and 1975)

Although John Malakoff was the only person who was personally familiar with virtually every stock transaction involving the alleged sale of stock to the stock claimants, Rosen, according to his application for an allowance, examined him three times in 1953, shortly after the Chapter X petition was filed. On December 24, 1953, Rosen stated that he intended to continue with the examinations of John Malakoff. (SM 49 of 12/24/53) Between December 24, 1953 and the date of John Malakoff's death in 1955, Malakoff was further examined by Rosen on only three separate dates, according to his said application. Deducting a proportion of the time, according to Rosen's instant application, spent in examining other persons on the days when he examined Malakoff, it appears that the six examinations of Malakoff aggregated about eight hours. This neglect compounded the difficulties encountered at the trial of the stock claims because Malakoff's death in 1955 sealed his lips without his testimony having been obtained.

Despite the conflicting claims to the debtor's stock, Rosen did not communicate with or contact one Helen Bernstein, who had acted as John Malakoff's secretary during the period when Malakoff was "issuing" stock in the debtor, for almost 4½ years after the filing of the Chapter X petition, (SM 1293) during which time she was a resident of New York City and readily available.

Whatever was accomplished ultimately in the determination of the stock claims is attributable in largest measure to the efforts and performance of the Examiner, Weinstein and attorneys who appeared for the claimants.

The major portion of the time spent by Rosen in the reorganization proceeding for which Rosen seeks compensation was spent in connection with the stock claims. Rosen's exaggerated evaluation of his contribution to resolving the stock

claims is sharply reduced by extracts culled from the record and appended hereto as Appendix "A".

The ultimate allowance of stock in the debtor was predicated upon the findings of fact which were made upon the Examiner's 236 page report of the evidence adduced during the 86 day trial.

Forty-one persons filed stock claims. The trial resulted in the recognition by the district court of 36 of these. Five were not passed upon. Rosen, for the debtor, appealed only from the allowance of 9 of the 36. The Court of Appeals struck down the district court's allowance of 6 of the 9 and *sua sponte* passed upon the 5 which were not decided by the district court. In summary, therefore, the effect of Rosen's appeal was to transfer the value of the 6 claims reversed, to the remaining claims allowed.

Rosen's repeated references in his application to the affirmance by the Supreme Court of the Court of Appeals' decision is erroneous. Certiorari having been granted and subsequently vacated as improvidently granted (Wolf v. Weinstein, 372 U.S. 633, 636, 83 S.Ct. 969, 10 L.Ed.2d 33) is not an affirmance. State of Maryland v. Baltimore Radio Show, Inc., 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562.

(E) *The allowance and disallowance of creditor claims.*

Rosen's application for compensation states that his services eliminated or reduced the following creditors' claims:

a) Ida Mae Margolis — $ 3,550.00
b) Benjamin Margolis — 25,000.00
c) Harry Forman — 5,000.00
d) Joseph Sherman — 11,000.00
e) Internal Revenue Service — 41,465.14
f) Metropolitan Edison Co. — 2,400.00
g) Seymour Forman — 10,000.00

The claim of Ida Mae Margolis for $3,550.00 was tried by Referee Joyce in conjunction with her claim for 15 shares of the debtor's stock. The issues involved in both claims were identical. By decision dated August 30, 1957 all claims of Ida Mae Margolis were disallowed by Referee Joyce. Whatever services Rosen performed in opposing Ida Mae Margolis' creditor claim were merely incidental to his opposition to her stock claim, part of which was later restored by the Court of Appeals as one of the five claims passed upon by that Court *sua sponte*.

As above stated, the obviously unsupportable claim of Benjamin Margolis for $25,000 was based on his costs and expenses in connection with the debtor's examinations of Benjamin Margolis pursuant to § 21a of the Bankruptcy Act. On August 10, 1955 the debtor moved for an order striking out or dismissing Margolis' claim for $25,000. On August 17, 1955 a hearing was held on the debtor's motion. On the same day, Referee Joyce endorsed the motion papers as follows:

"Claim disallowed

No objection."

On August 31, 1955 Referee Joyce made an order, (notice of settlement of which had been waived by Benjamin Margolis' attorney) dismissing and disallowing Margolis' said claim for $25,000.

Rosen asserts that Harry Forman's claim for $5,000 was disallowed as a product of Rosen's opposition. The filed papers, Referee's docket and the district court docket fail to disclose any such claim although it was the subject of some testimony during the trial of Forman's stock claim.

Two claims were filed by Joseph Sherman, one for $10,000 for breach of contract and another for $1,000 on a promissory note. During the trial of these claims Sherman abandoned his $10,000 claim. He succeeded on his $1,000 claim. Rosen, in his instant application, claims sole credit for the result. The record (SM 9254–9471) establishes that the result was achieved mainly by the Examiner with assists by Benjamin Margolis, Robbins and Rosen.

Rosen's application states that the Internal Revenue Service filed a claim against the debtor for $41,465.14, representing income tax on alleged income of the debtor while in possession. The Referee's and the district court's dockets do not reflect the filing of any such claim although it may have been presented to the debtor.

Rosen's application indicates that after consultation with Gilbert Sunshine, who acted as the debtor's accountant, Rosen pointed out in accordance with Sunshine's advice, that the alleged profits of the debtor were illusory since they were subject to the expenses of administration and were subject to deductions resulting from losses in connection with the issuance of its stock and distributions made in regard thereto.

The total of Rosen's services in conveying Sunshine's opinion which brought about the withdrawal of the possible tax liability was possibly one conference (alluded to in his instant application but not listed in the schedules attached thereto), a few telephone calls and two letters. Whatever his services might have been in the premises, they are probably not compensable because they did not arise "in this and all other proceedings and actions" to which Judge Holtzoff limited Rosen's retainer after rejecting a request for Rosen's employment under a general retainer.

Rosen states in his instant application that he filed an objection to the claim of Metropolitan Edison Co. of Pennsylvania for $2,400 and that he compromised the claim for $1,450.

No such claim and no objections thereto appear to have been filed. What does appear from the granting of the debtor's request for leave to compromise a debt incurred prior to the reorganization proceeding is that in July, 1952, Metropolitan Edison Co. of Pennsylvania installed electric poles and appurtenant equipment on the debtor's property at the agreed price of $2,400, which was not paid.

The debtor petitioned this court for authority to compromise and settle the indebtedness owing to Metropolitan Edison Co. for $1,450 on, *inter alia*, the affidavit of Jerome Fried, general manager of the debtor, sworn to May 28, 1954, that it was his negotiations with representatives of Metropolitan Edison Co. which resulted in the reduction of the said company's claim to $1,450.

Rosen, except for the drawing of legal papers presented to the court, did not in any way negotiate the settlement of Metropolitan Edison Co.'s claim.

Seymour Forman filed a creditor's claim for $5,000 against the debtor, and not $10,000 as stated by Rosen in his application. Since this $5,000 was part of $15,000 which claimant alleged was the consideration for the 15 shares of the debtor's stock for which Seymour Forman also filed a stockholder's claim, it was disposed of in the determination of his stockholder's claim without any additional services rendered by Rosen.

(F) *Leases entered into by the debtor.*

Rosen's application states that he helped to negotiate and draft 13 leases entered into by the debtor during the course of the reorganization proceeding. Rosen was aided in the preparation, negotiation and drafting of many leases by Weinstein, (SM 10188) although Rosen's application is devoid of any reference to Weinstein's aid. Weinstein, who is a lawyer, was readily available for these and other consultations because he and Rosen shared office space.

By order of November 1, 1956 the court directed that any and all leases for a term of one year or more be submitted to the Examiner for his written consent thereto, prior to execution by the debtor. As is elsewhere indicated herein, the proffered leases were substantially amended and improved by the Examiner, a fact also ignored in Rosen's application.

(G) *Plan of reorganization for the debtor.*

Rosen's application states that he submitted "on at least three occasions, Plans of Arrangement" and that "as a result of petitioner's services * * * the Plan of Arrangement was confirmed."

No plan of "Arrangement" was submitted, approved or confirmed in the reorganization proceeding of this debtor. The plan of reorganization finally approved and confirmed was primarily a product of the labors of the Examiner.

In addition to Rosen's claim for services rendered under sections (A) through (G), supra, he claims to have rendered services in other areas.

One of the most important matters dealt with in the course of the reorganization proceeding was the proceeding instituted pursuant to § 249 of the Bankruptcy Act. This proceeding, discussed in greater detail elsewhere, was instituted by a stockholder of the debtor represented by Robbins for, *inter alia,* the recoupment of salaries and disbursements paid to Weinstein and Jerome Fried, general manager of the debtor (hereinafter Fried) who traded in its stock during the course of the reorganization, resulted in a substantial benefit to the debtor's estate.

Rosen, in his application, deals with the § 249 matter only in reciting his services in the Supreme Court.

*In limine,* reference should be made to the curious discrepancy between Rosen's application as filed in court and as served on the Examiner, as disclosed in Robbins' brief. Rosen's filed application deals with his services in the Supreme Court only on pages 31 and 32, and at those pages attributes 371 hours at $50 an hour. On the other hand, in recapitulating his time, Rosen, at page 51 of his said filed application in Par. 117, attributes 402 hours for this service.

To further complicate the comprehension of his claim for services in the Supreme Court, Rosen, without altering the recitals of 371 hours set forth as aforesaid at pages 31 and 32 of his filed application, incorporates in the copy of his application served on the Examiner new pages 16 and 17 of Schedule C, never included in the original filed in court, and thereby aggregates the hours spent in the services performed in connection with the appeals to the Supreme Court at 461½ hours. At $50 an hour the substantial difference of 90½ hours is quite apparent. This inexplicable variance is but one of the many factors making Rosen's application difficult to accept.

Returning to the substance of the § 249 litigation, it is undenied that Rosen was aware that Weinstein had acquired stock of the debtor during the course of the reorganization at a time when Weinstein was a fiduciary of the debtor and considered the deal as a "clean transaction." (SM 659)

Despite the aforesaid knowledge of Rosen, he did not undertake to institute any action or make any report of such acquisition on the debtor's behalf.

Indeed, once the § 249 proceeding was instituted, Rosen maintained that the debtor was merely a "stakeholder." (SM 9864) Although he attributed that posture to the debtor to immunize it against costs of the § 249 litigation, he never thereafter sought to have the debtor reimbursed by Weinstein or Fried for the debtor's expenses in that litigation.

Notwithstanding the professed neutral position of the debtor, Rosen supported Weinstein's and Fried's defenses and advocated that § 249 did not apply to them. [Debtor's brief, Supreme Court, p. 63, October term No. 70.]

Section 249 was violated by Weinstein and Fried, [Wolf v. Weinstein, 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963)] as a result of which the debtor was awarded judgments in the sum of $119,-151.54.

One of the other areas in which Rosen claims to have rendered compensable services is attendance at stockholders' meetings. Since no information is supplied to indicate that these services were within the boundaries set by Judge Holtzoff of the permission granted to the debtor to employ Rosen, they are not compensable.

Coupled with his evaluation of services, Rosen seeks reimbursement of ex-

penses of $724.54. Certain of these are unjustified:

a) a charge of January 24, 1961, in the amount of $35 by Athena J. Cook for typing, which the debtor was directed to pay;

b) a charge of August 11, 1961 in the amount of $99.91 by Loder Appeal Press which was held not to be a proper charge against the debtor; and

c) a charge of $340 by Verbatim Service Co. for typing Rosen's instant application for an allowance.

Accordingly, Rosen's assessable disbursements are reduced to $249.63.

■ In In re Hudson & Manhattan Railroad Co., 339 F.2d 114 (2d Cir. 1964), Chief Judge Lumbard wrote that:

"We wish to emphasize that any attorney who hopes to obtain an allowance from the court should keep accurate and current records of work done and time spent. Lawyers are well aware that, especially where services of the nature here involved are spread over a period of time and ulti-

mate payment is virtually assured, they are valued principally on the basis of the time required. There is no excuse for an established law firm to rely on estimates made on the eve of payment and almost entirely unsupported by daily records or for it to expect a court to do so."

Chief Judge Lumbard reiterated the rule in In the Matter of Wal-Feld Company, Inc., 345 F.2d 676 (2d Cir. 1965), Judge Moore adverted to it in In re General Economics Corp., 360 F.2d 762 (2d Cir. 1966), and Judge Herlands demonstrated its application in In re Seaboard Drug Company, 242 F.Supp. 571 (S.D. N.Y.1965).

Rosen testified that his application for an allowance was prepared from a record maintained by him of services rendered and time spent by him. (SM 14822)

Attention is first addressed to the schedules of compensable time and services claimed by Rosen to have been devoted to the debtor's interests, annexed to his application. These schedules are as follows:

| Schedule | Subject |
|---|---|
| A | Appearances in court for examinations, trials and hearings |
| B | Preparation and analysis of legal documents |
| C | Memoranda of law |
| D | "In the matter of having my secretary type, checking and appearance in Clerk's office of Referee for the purpose of filing the affidavits for countersignature of checks and getting the Referee to countersign the checks and in many instances, having affidavit amended at the request of the Referee." |
| E | "Appearances in Court for the purpose of filing and submitting the documents listed." |

In addition, Rosen has attached schedules to his application which purport to list conferences held by him, out-of-town trips, meetings of stockholders and directors, and correspondence prepared

and received by him in connection with the reorganization proceeding.

Schedule B states that on January 8, 1954, Rosen spent one hour preparing an affidavit of service by mail of Anna

E. Lubbe which was sworn to on the day before, January 7, 1954.

Schedule B states that Rosen spent a total of six and one-half hours on January 26, 27, and 29, 1954 checking "Margolis affidavit in opposition to a proposed lease for Fried and LaGrotte." Said affidavit is eight pages in length exclusive of exhibits which were copies of documents prepared by Rosen.

Schedule B states that Rosen spent one and one-half hours on January 29, 1954 preparing the affidavit of Weinstein, sworn to a few days earlier on January 25, 1954, in support of a proposed lease for Fried and LaGrotte.

Rosen's Schedule B states that on September 21, 1954, he spent one hour "checking" the memoranda endorsed on petitions and notices of motions filed September 9 and 17, 1954. The said petitions and notices of motions each had the following endorsement:

"September 21, 1954
Respectfully submitted to

Judge Sugarman

    s/ Sylvester J. Ryan

       U.S.D.J."

In Schedule E Rosen charges one-half hour on September 21, 1954 for the same services as to the motion filed September 17, 1954.

Rosen's Schedule B states that he spent two hours on September 23, 1954 "checking" the memoranda decisions denying the motions filed September 9 and 17, 1954. The memorandum appearing on each petition reads:

"September 23, 1954

Motion denied without prejudice to a renewal thereof after jurisdiction is finally decided.

    s/ Sidney Sugarman

       U.S.D.J."

Schedule B states, "checked memo on petition filing of weekly reports" for one and one-half hours on October 8, 1954.

The said memorandum appearing thereon is as follows:

"October 8, 1954
Motion Granted

    s/ Sidney Sugarman

       U.S.D.J."

Rosen's Schedule B states that he spent one hour on April 21, 1955 checking a memorandum endorsed on a motion. That memorandum reads:

"April 20, 1955
Motion granted to retain Young Adjustment Company at 10% fee and settle claims against insurance company for $14,500 approximately.

    s/ Sidney Sugarman

       U.S.D.J."

Rosen's Schedule B states that on May 15, 1956 he spent two hours "checking" the answer of Benjamin Margolis to a petition to resettle an order of January 5, 1955. The said petition, according to an affidavit of service made by Rosen's son, was personally served upon Margolis on 9:38 a. m. on May 16, 1956.

On April 7, 1958, Rosen spent twenty-two hours checking various papers and preparing a notice of hearing in connection with the within proceeding, according to Schedule B. In addition, according to Schedule A, he attended a hearing for six hours on the same day.

On January 7, 10 and 12, 1961, Rosen's Schedule B states that he spent a total of eleven and one-half hours "checking" three notices of appeal. These notices together totalled thirty typewritten lines.

Schedule B states that on February 16, 1962, Rosen spent one and one-half hours checking an order entered on February 16, 1962. Thereafter, Schedule B charges two hours spent by Rosen on March 16, 1962 in checking a notice of appeal from that order of February 16, 1962, containing seven typewritten lines.

Rosen's Schedule D is twenty-three pages in length and purports to show that he spent a total of two hundred sixty-one hours (which amounts to $6,525 of the fee sought) in connection

with the affidavits submitted to the Referee to procure the Referee's counter-signature on checks.

All of the affidavits were substantially the same in form. The form of the affidavit was very simple, according to Rosen [copy of letter of Rosen to Martin Phillip, Esq. dated July 8, 1960 in Referee's file]. Rosen did not draft the affidavits referred to in Schedule D. (SM 14841)

Although Rosen claimed time in explaining the affidavits to the Referee (SM 14842) he includes only once in his application, in Schedule A under the date of June 15, 1964, such a conference with Referee Ryan.

It is impossible to ascertain from Rosen's application and testimony whether he seeks this $6,525 for his services or those of his secretary [see quotation, supra, from title page of Schedule D].

As its title, hereinabove quoted, indicates, Schedule E purports to list appearances by Rosen in court to file and submit papers.

Schedule E states that on May 11, 1954, Rosen delivered to the courthouse for filing, a petition and order to show cause why a subpoena should not be vacated. The said petition was made by and on behalf of Benjamin Margolis, on whom Rosen had caused the subpoena in question to be served.

Rosen's Schedule E charges one and one-half hours on December 17, 1954 for filing an affidavit made by Weinstein with respect to a hearing held on the question of the construction of a new building by the debtor. Rosen's Schedule A charges three hours for his presence at the same hearing. The said affidavit of Weinstein bears the notation that it was filed at the hearing.

A mystifying aspect of Schedule E, the title of which is quoted supra, is how Rosen succeeded in appearing in court for the purpose of filing and submitting documents on the following dates:

January 1, 1954 (New Year's Day)
April 4, 1954 (Sunday)
January 2, 1955 (Sunday)
March 6, 1955 (Sunday)
December 18, 1955 (Sunday)
March 16, 1958 (Sunday)
April 6, 1958 (Sunday)
April 20, 1958 (Sunday)
July 6, 1958 (Sunday)
August 10, 1958 (Sunday)
October 23, 1960 (Sunday)
March 26, 1961 (Sunday)
December 10, 1961 (Sunday)
May 6, 1962 (Sunday)
July 1, 1962 (twice) (Sunday)
May 5, 1963 (Sunday)
January 19, 1964 (Sunday)
January 26, 1964 (Sunday)
March 1, 1964 (Sunday)

In my opinion, the trips to and from the courthouse listed in Schedule E, consuming 67½ hours, to file papers, could as well have been made by a $50 a week messenger as by a $25 an hour attorney.

Enough has been shown to justify a belief that the accuracy of the schedules and application which they are offered to support, is doubtful. Since they are predicated, according to Rosen's testimony (SM 14822), on his records, the accuracy of his records must be held equally suspect.

Rosen has failed to establish that quantitatively or qualitatively his services on the debtor's behalf were of the fair and reasonable value placed by him at a quarter of a million dollars or of the $150,000 which he requests.

However, having presided over this reorganization virtually since its inception, I appreciate that Rosen did render a measure of services beneficial to the debtor. I agree with the objections filed by Weinstein to Rosen's request for an allowance of $150,000 to the extent that he states that "services * * * may actually have been rendered" by Rosen but that $150,000 as an allowance of counsel fees is disproportionate to the size of the estate involved." These services I evaluate at a fair and reasonable value of $25,000 including his

disbursements. I would allow Rosen that amount were I not constrained to award him nothing (except his disbursements of $249.63) for his failure to comply with the mandate of In re Hudson & Manhattan Railroad Co., supra.

Rosen did not maintain accurate and current records of work done and time spent. Appended hereto as Appendix "B" are commentary and extracts from the record upon which I conclude that the only records that Rosen might have kept were those of the fragmentary nature of the typewritten cards which he introduced in evidence in March, 1959 at the hearing on his claim of $3,750 as a creditor for pre-reorganization services rendered to the debtor, resulting in an ultimate allowance of $1,200.

Even had these been introduced they would have been insufficient—hence the story of the stolen briefcase and docket.

Accordingly the order to be entered hereon will allow Rosen disbursements of $249.63.

### Weinstein's Objections

Weinstein, a stockholder of the debtor, filed objections to the applications of Robbins and the Examiner for compensation and reimbursement of expenses incurred herein. The gravamen of the objections common to those applications is:

"That from and after September 1, 1956 and after the appointment of * * * Charles Seligson, as Examiner, and during his tenure of office and during the course of this Chapter X proceeding, Robbins was, on terms not known to this respondent, employed by, or participated in ventures with, or was engaged by, * * * Charles Seligson, in connection with the practice of law or otherwise. * * * "

Weinstein prayed that the applications of the Examiner and Robbins be denied.

Robbins was employed by the law firm of Seligson, Morris & Neuburger as an associate in said firm from December 21, 1953 until August 31, 1956. (SM 15005) The Examiner was a senior partner of said firm.

After the termination of his employment Robbins continued to work on four matters for the said law firm which were not completed on August 31, 1956 and on which he had worked while employed by the said law firm. Those matters were:

(a) Concord Supplies & Equipment Corporation, Bankruptcy No. 91767;

(b) Peerless Corp., Bankruptcy No. 81016;

(c) Parry Lines, Inc., Bankruptcy No. 86790;

(d) International Winter Sports Show, Inc., Bankruptcy No. 90792 (SM 15010).

Thereafter the firm of Seligson, Morris & Neuburger engaged Robbins to work in connection with two matters. These matters were:

(a) A claim of Walter E. Heller & Co. (SM 15012) in the summer of 1957;

(b) U. S. v. Fruehauf, et al., S.D.N.Y. Crim. No. 159–138 in the fall of 1959 (SM 15013).

At all times subsequent to September 1, 1956 when Robbins worked on behalf of the law firm of Seligson, Morris & Neuburger, he worked in the capacity of an independent attorney.

Robbins disclosed his relationship with the Examiner to Rosen and Weinstein on or about October 1, 1957 (SM 15073), *vide* the debtor's petition for leave to compromise claims, dated February 28, 1958 signed by Weinstein as president of the debtor and Rosen as attorney for the debtor at paragraph 78:

"On information and belief, it appears that his [Rehrig's] attorney, Martin Phillip, Esq. ascertained that Charles Seligson had been appointed Examiner by the Honorable Sidney Sugarman and that the Examiner's employee or former employee, Melvin Lloyd Robbins, Esq. was and is working on various matters with Charles Seligson and his firm."

In addition, on June 12, 1958, during the stock claims hearings at which Rosen and Weinstein were present, Richard Hull, on cross-examination by the Examiner testified as follows:

"Q. In the course of your discussion [held on June, 1957] with Mr. Robbins on this first occasion or any subsequent occasion was my name mentioned?

A. Yes.

Q. In what regard?

A. Mr. Robbins told me that at one time he had been associated with you and that was all.

Q. Is that all he said about me?

A. He said he was no longer with you or he said he does some work as sort of an independent contractor but he is not associated with you now.

Q. Was there anything else said about me or about my activity in this case?

A. No, he told me that you were a Professor—

Q. No, about my activity in this case?

A. That you were the Examiner, and that was all." (SM 2233)

On June 12, 1958 Weinstein also cross-examined Mr. Hull as follows:

"Q. Did Mr. Robbins volunteer to you that he had formerly been associated with Professor Seligson, the Examiner here?

A. Yes.

Q. Did you ask the extent of that association?

A. Yes. He told me that he had— He used to be employed with Mr. Seligson and that he is no longer employed by him but occasionally he does work for him.

*    *    *    *    *    *

Q. And I think you testified that Mr. Robbins also told you that he still does some work for Professor Seligson; is that so?

A. Yes.

MR. WEINSTEIN: That is all." (SM 2269)

On February 9, 1959 the question of the Examiner's relation with Robbins again was discussed at length on the record as follows:

"MR. WEINSTEIN: * * * There was also some testimony to the effect that Mr. Robbins believed, whether rightly or wrongly, but he believed that the professor was going to be a particular friend of his in this case.

*    *    *    *    *    *

MR. SELIGSON: Your Honor, very serious charges have been made. I think Mr. Weinstein and Mr. Rosen ought not to indulge in speculation. If they have any basis in fact for the charges they make I think there ought to be some written specifications filed here, because, your Honor, if these charges are not proved I intend to do something about it.

*    *    *    *    *    *

MR. SELIGSON: Mr. Weinstein has gone much beyond that, your Honor, with his insinuation, and I think there ought not to be insinuation with charges as serious as these. I think Mr. Rosen and Mr. Weinstein ought to be required to put these charges in writing and to supply your Honor, in any event, with the basis of these charges; not with the speculation that this may have been the case or this may have happened; not to pull them out of the thin air and make charges of that kind. This is something that reflects upon me and I am very much interested in finding out what the true facts are here.

*    *    *    *    *    *

THE COURT: * * * Now, if you have any basis upon which to develop in the normal, intelligent way of the processes in the Federal Court, if you have any basis predicated either upon facts or a deposition, you will get your day in court, but if you think I am going to sit here as a Special Master to serve your whim to go on a fishing expedition to find out whether there is any such basis, let me tell you, sir, that you are vastly in error. That is not the function of a judge.

Your application is denied. But you are at liberty to hold depositions, and when you have got something in the way of proof you will be given your day in court to develop it. And for your information, sir, I would address you to a section of the rules which may emphasize the avenue of my thinking in this regard, and I am referring to the last sentence of FRCP 26(b) which reads:

'It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence.'

Now, if a deposition should develop admissible evidence as to any improprieties here, then and not until then will I be spending my time in going on a fishing expedition. That is your obligation. You do it by deposition.

Now, is there any other basis for wanting to inquire into the validity of the assignments of those people represented by Mr. Robbins?

MR. ROSEN: If your Honor recalls, I made an application—I put it on the line—I made an application and asked for a mistrial on the ground that Mr. Robbins, while Professor Seligson was an active examiner in this proceeding, I felt that not only was there a relationship, which means nothing, but that he was working on a number of matters for Mr. Seligson and at the same time, and I used the expression, he was raiding this corporation, and at that time I asked for a mistrial. I did not accuse anyone of anything, but I felt that it was improper, your Honor, for someone to continue doing work in the employ of the examiner to make a raid, to have on the face of it the connection of being employed by the examiner.

THE COURT: All right, get to your point, please. You moved for a mistrial and I denied it.

MR. ROSEN: Yes, that is right.

THE COURT: Now what is your point?

MR. ROSEN: That is the reason, your Honor. As long as there is this question that Mr. Robbins was still working for the examiner and was purchasing this stock under the general circumstances that are involved in this case, I felt that I wanted to go into the question of those transfers and sales. That doesn't mean there is anything wrong with the examiner and I have never so stated, but it just means that this thing—

THE COURT: All right, and I give you the same answer I just gave to Mr. Weinstein. I am not going to preside at a fishing expedition.

\* \* \* \* \* \*

MR. WEINSTEIN: I think I can, Judge. If it can be shown that Mr. Robbins, because of the very close relationship that he had with a member of Professor Seligson's staff, that as a consequence of that close relationship, and because that member of his staff had been assigned to this case by Professor Seligson, and that this member of the staff of Professor Seligson, known to the examiner, warped, biased and colored statements of fact with respect to the stock claims which were purchased by Mr. Robbins' client—on that theory, your Honor, I say that it is mightily material that we inquire into it.

\* \* \* \* \* \*

MR. SELIGSON: Your Honor, I think I am entitled to know this: does Mr. Weinstein charge, and Mr. Rosen, that I have been derelict in my duty in this court?

MR. ROSEN: Absolutely not.

MR. WEINSTEIN: No." (SM 6113)

Accordingly, Weinstein's testimony on October 21, 1965 that

" \* \* \* it was not until the summer of 1960 that I learned for the first time that Mr. Robbins was doing any work for the Examiner during the course of these proceedings \* \* \*." (SM 15315)

is false.

In any event Robbins ceased doing any work for the Examiner's firm on October 11, 1960 (SM 15015).

■ Weinstein's objections to allowances being awarded the Examiner and Robbins because of their relationship outside of this proceeding prior to October 11, 1960 is overruled for the reason that the relationship did not present an inherent conflict of interest on the part of either the Examiner or Robbins and the relationship resulted in no impropriety, appearance of irregularity or even basis for criticism.

Despite, as the record shows, that the door was left open to an exploration of this issue, neither Weinstein, Rosen nor anyone else ever properly raised the question.

■ Weinstein's objection to the allowance sought by the Examiner that the Examiner's services were unnecessary, a duplication of effort and wasteful to the estate, is overruled. The inadequate performance by the debtor, of which Weinstein was president and by the debtor's attorney Rosen, gave the court the choice of removing the debtor from possession and appointing a trustee or allowing the debtor to remain in possession and appointing an Examiner to advise the court in the reorganization. The nature and location of the debtor's business made the latter course the more feasible. The Examiner ably discharged every duty imposed upon him by § 168 of the Bankruptcy Act and the court's directions throughout the proceeding.

Weinstein's remaining objection as to the Examiner is overruled. If it had any substance that was dispelled by the amended affidavit under local rule X–19 (g) filed by the Examiner on March 25, 1966.

Weinstein's objections to an allowance to Robbins on the basis of any impropriety between Robbins and the Examiner's employee, Mandel, is overruled. None such occurred. (SM 15215 and 15283)

■ Weinstein's objection to an allowance to Robbins for violation of § 249 of the Bankruptcy Act is overruled for the reason that Robbins merely acted as an attorney for clients who dealt in the debtor's stock (thereby differing from Weinstein and Fried) and acquired none himself and received no finder's fees or commissions in that connection (SM 14945 and 15285).

■ Weinstein's objection to an allowance to Robbins because Robbins' success in recouping for the debtor substantial sums for which he seeks compensation were motivated by Robbins' purpose of representing his clients is overruled for the reason that the sole beneficiary of Robbins' endeavors was the debtor regardless of his motive.

■ Weinstein's objection to Robbins being allowed compensation for services which benefitted the debtor and for which Robbins had been compensated by his clients is overruled to the extent of the recoupment of salaries and expenses by the debtor from Weinstein and Fried. To that extent Robbins was not compensated by his clients. (SM 15042)

Finally, the application filed by Robbins for an allowance herein complies with local rule X–19(g) in that the relationship between the Examiner and Robbins had long before been revealed as aforesaid.

Having disposed of Weinstein's objections, we turn now to the determination of the applications of Robbins, Sunshine and the Examiner.

### Robbins' Application

Robbins has applied for an allowance of compensation of $43,157.45 and for reimbursement of expenses incurred by him in the sum of $3,115.38. Robbins asks that he be awarded $23,012.32 in cash (based upon payments to the debtor by Weinstein and Fried assumed to have been made as of September 20, 1965), the balance of $20,145.13, from installment payments due to the debtor from Jerome Fried as a result of the judgment against Fried held by the debtor.

On or about October 20, 1956 Robbins was retained by Wilson D. Rehrig (hereinafter Rehrig), a tenant of the debtor's

market in Nazareth, Pennsylvania, and Martin H. Phillip (hereinafter Phillip), Rehrig's counsel, to represent them in this proceeding.

During the course of the reorganization proceeding Robbins has also represented Frederick Katzenell, a stock claimant, Richard S. Hull, a stock claimant and former director of the debtor, Charles Kanter, a stock claimant, Ernest Pollak, a stock claimant, Ann Rosen, a stock claimant, Leon A. Stemler, an assignee of a stock claimant, and Robert H. Davidson and Irving J. Wolf (hereinafter Wolf), the nominees or trustees of several of the stock claimants.

On March 21, 1958, Robbins filed a statement as is required under § 210 of the Bankruptcy Act, and filed amendments thereto on November 12, 1958 and December 21, 1960. The statement and amendments were filed with the Referee.

By petition verified March 13, 1959 Robbins' client Wolf sought the termination of compensation being paid by the debtor to Weinstein, the debtor's then president and Fried, the debtor's general manager, and the recoupment of salaries previously paid to them during the reorganization proceeding by the debtor. The petition alleged that Weinstein and Fried had violated § 249 of the Bankruptcy Act by trading in shares of the debtor's stock during the reorganization proceeding.

In the summer of 1958, the § 249 petition was referred to Referee John E. Joyce to hear and report. Thereafter, Referee Joyce recommended dismissal of the § 249 petition.

On December 21, 1959 and January 4, 1960 court hearings were held on the § 249 petition and the Referee's report. On the latter day, the Referee's report was disapproved and future compensation from the debtor to Weinstein and Fried was terminated but no order was entered on the termination of compensation until June 14, 1960.

By petitions verified January 5, and 6, 1960 Wolf, *inter alia*, petitioned for termination and recoupment of compensation paid by the debtor to Wein-

stein and Fried on "general equitable grounds."

From January 25 to January 28, 1960 a trial was held on Wolf's petitions only with respect to the recoupment of compensation and termination of employment of Weinstein and Fried on general equitable grounds. Robbins represented the petitioner, Wolf, in that proceeding.

No order having been entered on the decision of January 4, 1960 terminating Weinstein's and Fried's employment and no decision or order having been made on the application for recoupment and removal, tried in January 1960, on May 27, 1960 Wolf petitioned for an order terminating future compensation of Weinstein and Fried. On June 14, 1960 on the record at a hearing it was ordered, *inter alia*, that Weinstein and Fried, for having dealt in the debtor's stock, cease receiving compensation and cease participating in the management of the debtor as president and manager, respectively, as a condition to the debtor remaining in possession. Recoupment was however denied.

On June 22, 1960 Weinstein and Fried appealed the order of June 14, 1960 and applied to the Court of Appeals for a stay pending appeal. The application for a stay was argued the same day.

On July 12, 1960 the Court of Appeals stayed that part of the June 14, 1960 order which provided for the termination of Weinstein's and Fried's employment and gave leave for the making of findings of fact and conclusions of law by the district court. Such findings and conclusions were filed on November 23, 1960.

On December 21, 1960 Wolf filed a cross appeal from the June 14, 1960 order and from those parts of the findings and conclusions filed November 23, 1960 which did not provide for the recoupment of compensation and the formal removal of Weinstein and Fried.

The appeals were argued on August 17, 1961 and the decision of the Court of Appeals, reversing this court, was published on November 9, 1961 (296 F.

2d 678). The Court of Appeals refused to order termination of compensation and employment by the debtor of Weinstein and Fried, and refused to order recoupment of compensation paid by the debtor to Weinstein and Fried.

Wolf petitioned for rehearing on November 21, 1961, which was denied on November 29, 1961 without opinion.

Wolf petitioned to the Supreme Court for certiorari on February 21, 1961, which was granted on April 2, 1962 (369 U.S. 837, 82 S.Ct. 868, 7 L.Ed.2d 841).

The case was argued on February 20, 1963 and the Supreme Court announced its decision on April 15, 1963 (372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33). The Court ordered the termination of further compensation and recoupment of past compensation paid by the debtor to Weinstein and Fried, and remanded the question of their removal from office.

Petitions for rehearing were denied on May 20, 1963 (373 U.S. 928, 83 S.Ct. 1522, 10 L.Ed.2d 427).

The Court of Appeals remanded the § 249 matter to this court for an accounting of the past compensation paid by the debtor to Weinstein and Fried.

On October 2, 7 and 9, 1963 hearings were held on the § 249 restitution issue. On January 29, 1964 Weinstein was ordered to pay to the debtor $25,251.53 and Fried was ordered to pay to the debtor $93,900.01.

In February, 1964 Weinstein paid the sum of $25,251.53 to the debtor and on February 26, 1964 judgment against Fried in favor of the debtor in the sum of $93,900.01, without interest, was entered.

Wolf appealed from said order with respect to the lack of interest on the sums paid and to be paid by Weinstein and Fried respectively, but the appeal was dismissed, on motion of the debtor's attorney, on May 25, 1964 for lack of prosecution. Wolf's motion to vacate the order dismissing the appeal was denied on October 27, 1964 by the Court of Appeals.

Robbins, acting as attorney for Wolf, alone bore the laboring oar in the prosecution of the § 249 petition and was solely responsible for recouping for the debtor $25,251.53 from Weinstein and a judgment for $93,900.01 from Fried, which as a result of a compromise entered into on April 2, 1964 over Robbins' opposition is being amortized by Fried at the rate of $783.50 per month since May 1, 1964.

Robbins also seeks compensation for the following benefits which he claims inured to the debtor through his efforts:

|  |  |  |
|---|---|---:|
| (a) | Value of Fried's services (at $10,000 per year) as manager of debtor (4/15/63 – 6/30/65) without compensation because of termination | $22,000.00 |
| (b) | Value of race track equipment transferred to debtor in compromise of cross-claims by Fried and Nazareth Enterprises Inc. and debtor | 25,500.00 |
| (c) | Rent increase under race track lease | 923.22 |
| (d) | Interest disallowed on Carty loan | 2,700.00 |
| (e) | Printing costs disallowed to Rosen | 1,005.02 |
|  |  | $52,128.24 |

As to (a) above Robbins offered no proof to support this item.

As to the remaining items above the record is obscure as to whether Robbins was compensated by his clients for these services. All that he categorically testified to was that he was not paid by his client for the § 249 litigation resulting

in the recoupment by the debtor as aforesaid. (SM 15042)

Robbins seeks reimbursement of expenses aggregating $3,115.38. Of these the following (incurred in the recoupment matter) only are allowed:

1960

| | |
|---|---:|
| December 21 | $ 5.00 |

1961

| | |
|---|---:|
| July 10 | 804.49 |
| August 15 | 27.61 |
| December 27 | 76.17 |

1962

| | |
|---|---:|
| January 16 | 29.50 |
| January 19 | 26.30 |
| July 30<br>October 15<br>March 28 | 372.36 |
| November 29<br>December 20<br>April 4, 1963 | 1,392.88 |
| November 30 | 21.00 |
| December 4 | 14.81 |

1963

| | |
|---|---:|
| February 15, 21 | 168.92 |
| February 17, 20 | 15.00 |
| February 17, 20 | 24.56 |
| Total | $2,978.60 |

No issue as to the accuracy or sufficiency of the time records which Robbins testified he maintained (SM 15066) was raised by anyone in the proceeding.

■ Accordingly Robbins is allowed reimbursement of expenses of $2,978.60 and compensation of $17,872.73 representing 15% of the total recoupment of $119,151.54 by the debtor from Weinstein and Fried.

The order to be entered hereon will allow Robbins the total of $20,851.33 and will provide that $10,000 thereof be paid upon the entry of the order and the balance with interest at 6% per annum be paid monthly by the debtor at the rate of $783.50 and that Robbins have a lien on the judgment in favor of the debtor and against Fried as security for

the payment by the debtor of the said balance of $10,851.33, which sum the debtor will pay in monthly installments as aforesaid regardless of whether it receives the monthly installments from Fried under its compromise agreement with him.

*Sunshine's Application*

Sunshine has applied for compensation for services rendered by him in the reorganization proceeding as an accountant in the amount of $8,925.

These services, aggregating 408 hours, were rendered at the behest of the Examiner. (SM 14844)

During the 12 day calendar period October 5, 1956 to October 16, 1956, inclusive, Sunshine spent fourteen working days preparing profit and loss statements and balance sheets of the debtor from its organization to October, 1956.

Sunshine spent three and one-half working days in April, 1957 preparing a report of the debtor's operations for the period July 1, 1956 to December 31, 1956.

Sunshine spent two working days in August, 1957 preparing a detailed listing of tenants of the debtor and a statement of projected income and estimated annual expenses of the debtor.

Sunshine spent five and one-half working days in October, 1957 in preparing a report of the debtor's operations for the period July 1, 1957 to August 31, 1957.

Sunshine spent five and one-half days in November and December, 1957 in preparing clarification of a report of the debtor's operations for the period July 1, 1957 to October 31, 1957.

Sunshine spent eleven and one-half working days in December, 1957 preparing a detailed report in accordance with a letter of the Examiner dated December 9, 1957.

Sunshine spent three and one-half working days in April, 1958 preparing a detailed schedule of accounts payable as of March 31, 1958.

Sunshine spent four working days in August, 1958 preparing a statement of the debtor's earnings as of May 31, 1958.

Sunshine spent one and one-half working days in November, 1959 preparing a schedule of debtor's accounts payable as of September 30, 1959.

Sunshine requests $21.87 an hour for the 408 hours spent ("51 working days" of 8 hours each).

Wolf (Robbins' client) is the only objectant to Sunshine's application. His objections are that Sunshine's services were not intended to benefit the debtor and that Sunshine was not employed pursuant to an order of this court in accord with General Order 45.

■ The first objection is overruled because the debtor did benefit from data supplied the Examiner by Sunshine.

■ As to the second objection, Sunshine's said employment is hereby ordered *nunc pro tunc* at a maximum amount of compensation of $4,500.

■ Inasmuch as during the course of these proceedings Sunshine received monthly payments from the debtor for accounting services rendered by Sunshine to the debtor, and apparently used the product of those services in complying with the Examiner's request, his hourly rate is reduced from the $21.87 requested to $10 per hour.

Accordingly, the order to be entered herein will allow Sunshine $4,080.

*The Examiner's Application*

■ The Examiner has applied for an allowance of compensation of $50,000 and for reimbursement of expenses incurred by him in connection with the reorganization proceeding in the sum of $1,001.87.

By order dated October 3, 1956 the Examiner was appointed in this proceeding pursuant to § 168 of the Bankruptcy Act to discharge the functions therein and in § 167 set forth. He duly qualified on October 3, 1956.

The Examiner's application lists several areas of the reorganization proceeding in which he rendered services, including (A) the reconstruction of the debtor's property in 1956–1957; (B) the resolution of conflicting claims to the debtor's stock; (C) transactions of the debtor with Fried and Nazareth Enterprises, Inc. and the § 249 proceedings; and (D) miscellaneous services.

All services for which the Examiner seeks compensation were rendered by him and his associates as Examiner, pursuant to orders and directions of the court.

(A) *The reconstruction of the debtor's property in 1956–1957.*

A fire severely damaged certain property owned by the debtor on August 28, 1956.

Because of the conflicting representations made by warring stock interests which precluded the court from making investigating the feasibility of rebuild- an objective appraisal of the desirability of rebuilding the fire damaged property, the Examiner was assigned the task of ing.

Pursuant to the court's instructions, the Examiner investigated the feasibility of the reconstruction of the damaged property by conferences with the debtor's officers, attorney and accountant, an examination of the books and records of the debtor, and a trip to the site of the debtor's market in Nazareth, Pennsylvania, and a study of estimates submitted by contractors for the reconstruction of the property destroyed by fire.

Hearings were held on October 11, 19 and 23, 1956, at which the Examiner appeared, informed the court of his investigations, and recommended that the property should, in the best interests of the debtor, be rebuilt.

On November 1, 1956, an order was entered for the reconstruction of the fire damaged property and directing that the debtor, through its general manager, Fried, be the general contractor for the job.

The Examiner regularly reviewed the progress of the reconstruction.

On November 1, 1956 the Examiner negotiated an agreement ultimately en-

tered into by the debtor with the major steel supplier for the financing of the steel to be used.

The Examiner appeared at and participated in hearings on the application of one Benjamin Margolis, a stock claimant, for a stay of the order of November 1, 1956 directing the rebuilding of the property destroyed by fire resulting, on December 26, 1956, in Margolis withdrawing his motion.

(B) *The resolution of claims to the debtor's stock.*

The central issue in this reorganization was the resolution of the forty-one proofs of stock interests which had been filed by stock claimants.

The Examiner spent a considerable amount of time investigating the background of the stock claims and the debtor and had numerous conferences with attorneys and claimants with respect to the stock claims.

The Examiner participated in all of the hearings held by me with respect to the stock claims and with respect to claims of creditors.

During the course of those hearings, lasting eighty-six trial days between May 19, 1958 and May 7, 1959, the Examiner adduced evidence, examined and cross-examined witnesses, and acted as an adviser to the court. He contributed in largest measure to the orderly development of the proof and the enunciation of pertinent legal principles.

On April 21, 1960 the Examiner filed a report, as directed by the court, on the stock claims tried to the court between May 19, 1958 and May 7, 1959. That report was characterized by the Court of Appeals as " * * * a detailed and painstaking report (236 pages), [in which] the Examiner carefully sifted the issues fundamental to the resolution of stock participation" (296 F.2d 670, 673).

On December 9, 1960 an order resolving the questions of the stock interests, which substantially incorporated the Examiner's findings, was entered.

As aforesaid in considering Rosen's application, six of the thirty-six claims considered by me were disallowed by the Court of Appeals and the case was remanded for decision on other phases, in which the Examiner participated fully.

(C) *Transactions of the debtor with Fried and Nazareth Enterprises, Inc. and the § 249 proceedings.*

On January 5, 1960 a petition was filed by Robbins for Wolf seeking the rejection or cancellation of a lease held by Nazareth Enterprises, Inc. (hereinafter Enterprises), a corporation controlled by Fried, covering a race track on the debtor's property. The petition also sought an accounting of percentage rents allegedly owed by Enterprises to the debtor.

The debtor, on November 8, 1957, had filed objections to claims previously filed by Fried against the debtor and a counterclaim for cancellation of the race track lease. The debtor never prosecuted the objections and counterclaim and never commenced any action against Fried or Enterprises for an accounting of the race track rents.

The race track petition was amended on June 30, 1960 to add allegations about certain receipts which had been allegedly unreported by Enterprises.

On November 2, 1960 hearings on the race track petition commenced and lasted ten trial days ending on November 22, 1960.

On June 28, 1961 a decision was made on the race track petition which, *inter alia*, invalidated a rent reduction which had been privately agreed to by Fried and Weinstein during the reorganization proceeding, and ordered an accounting of race track rents owed since 1955. The lease was not cancelled or rejected, and was found to be a "license." An order submitted by the Examiner was entered on the June 28 decision on September 12, 1961. Wolf appealed from the said order.

After a request by Fried and Enterprises to certify certain questions (pursuant to 28 U.S.C. § 1292(b)) was de-

nied, on January 9, 1962 Enterprises filed its accounting which acknowledged $22,090.41 in race track rents owed but unpaid to the debtor from 1955 through 1961.

On January 9, 1962 Enterprises proposed a compromise with the debtor, which involved an exchange of releases and claims, and the conveyance of certain equipment owned by Enterprises to the debtor.

On January 25, 1962 the debtor petitioned for approval of the compromise. After hearing, and on February 5, 1962 the compromise was approved, and an order was entered thereon on February 26, 1962.

On March 4, 1962 the debtor and Fried moved the Court of Appeals to dismiss Wolf's appeal from the September 12, 1961 order as moot. On the same day Wolf appealed the February 26, 1962 order, and the Court of Appeals consolidated the motion to dismiss and the appeal.

On May 4, 1962 the Court of Appeals reversed the compromise order of February 26, 1962 on procedural grounds and vacated the September 12, 1961 order on the race track petition, and remanded the cause pending the Supreme Court's decision in the § 249 proceedings.

On May 6, 1963 Fried and Enterprises proposed a second compromise of which the debtor petitioned for approval on June 14, 1963.

Following the deposition of Fried by the debtor, in which the Examiner's associate participated, Fried and Enterprises, on July 29, 1963, amended their compromise offer of May 6, 1963.

The amended compromise was considered at hearings held on October 2, 7 and 9, 1963.

By decision dated January 29, 1964, the debtor's petition to approve the amended compromise of May 6, 1963 was denied "as not being in the best interests of the debtor" on the Examiner's representation that the cash offer of Fried and Enterprises was inadequate.

On February 3, 1964 Fried and Enterprises made a third compromise offer to the debtor. The debtor, by petition of February 5, 1964 sought approval of the third compromise offer. A hearing was held February 10, 1964 and decision was reserved.

At my direction, the Examiner analyzed the third offer, as he had the first two, and after persuading the parties to make certain changes therein, ultimately recommended its approval. A detailed recital of the Examiner's role throughout the negotiations and hearings which brought about the final settlement of this complex phase of the debtor's affairs may be found at paragraphs 201 through 259 of his instant application.

Although the Examiner testified that he seeks no compensation for the actual money recovery by the debtor from Weinstein and Fried (which serves as the basis of the allowance made to Robbins, supra) the Examiner rendered valuable services to the debtor in connection with the § 249 proceedings as detailed in paragraphs 177 through 200 of his instant application.

(D) *Miscellaneous services.*

Throughout the nine years of the Examiner's tenure he rendered services at the court's direction in a multitude of miscellaneous matters, recounted in detail as to subject matter and time spent in his instant application, the more important of which were: proceedings involving amending, redrafting and improving leases for one year or more proposed to be entered into by the debtor; proceedings involving expenses and liabilities of the debtor not incurred in the ordinary course of its business; proceedings involving the debtor's relationship with its tenants and prospective tenants; meetings of the debtor's stockholders; and the evolution of the plan of reorganization ultimately approved and confirmed.

All of the Examiner's services, performed at my direction, proved to be of great value in the resolution of the many problems that plagued this reorganization.

64

No issue as to the accuracy or sufficiency of the time records which the Examiner testified he maintained (SM 14871) was raised by anyone in the proceeding.

The Examiner's application and testimony establish that, confined only to time spent for which acceptable supporting records exist, he should receive compensation for the following time spent by him and his associates:

610½ hours in court;

356 hours otherwise.

The request of the Examiner for an allowance of $50,000 represents $51 an hour for the 966½ hours accounted for. This hourly rate is indeed modest as compared with the customary hourly rate for in court and out of court services by a lawyer of the recognized expertise and reputation enjoyed by the Examiner.

■ Of the total of $1,001.87 in expenses, reimbursement of which the Examiner seeks, all are allowed except "stenographic services $79.00" not alleged to have been extraordinary. (Local Bankruptcy Rule 16(a))

The order to be entered hereon will provide for an allowance to Charles Seligson as Examiner herein of a total of $50,922.87 representing compensation of $50,000 and reimbursement of expenses of $922.87.

Settle an order.

## APPENDIX A

(SM 547)

"THE COURT: * * * Then you are objecting to any conversations had by anyone with John Malakoff, as testified to, until October 17, 1951?

"MR. ROSEN: That is right, your Honor, and then I object to any conversations with John Malakoff in an individual capacity subsequent to that date when it is not established that he was talking on behalf of the debtor corporation.

"THE COURT: When if ever did he begin talking on behalf of the debtor corporation?

"MR. ROSEN: That is for them to establish, your Honor. I don't know.

"THE COURT: You are the one who is making the objection. Am I to understand, then, that you are objecting to any conversations with John Malakoff, period?

"MR. ROSEN: I am objecting to any conversations with John Malakoff where it is not established that he was acting—

"THE COURT: I heard you, Mr. Rosen, and I am asking you. You have given me a date when he became an officer of the corporation.

"MR. ROSEN: Yes.

"THE COURT: Now you say you object to any conversation with John Malakoff until he became an agent of the corporation?

"MR. ROSEN: No, I didn't say that.

"THE COURT: What did you say?

"MR. ROSEN: I said that unless it is established that at a particular time he was not talking in his individual capacity but was talking in the capacity as an officer of the corporation. * * *

"THE COURT: Well, for whatever it means, what you have put in the record, you have made your objection, and it is overruled. * * *"

(SM 710)

"THE COURT: * * * The Harold Q. Masur claim was assigned to Blanche Waldman. What has testimony of any other assignments for disclosed or undisclosed clients got to do with the Harold Q. Masur claim?

"MR. ROSEN: That will go in on the general testimony also.

"THE COURT: Mr. Rosen, stop kidding me.

"MR. ROSEN: Yes, your Honor.

"THE COURT: I don't know whether you are doing it deliberately or just innocently. You told me you were calling Mr. Robbins on the Masur claim.

"MR. ROSEN: That is right.

"THE COURT: This three ring circus has been going on for three years. You have been wearing a red coat and

a high hat and snapping the whip. I am trying to unravel this, and if you are going to put in a mish-mash, if I may use the word, of evidence, like a crazy jigsaw puzzle, I will no [know] less about this case than you do. All of this testimony is expunged. It has nothing to do with the Masur claim. Bring it in at the proper time." (SM 587–588) * *

"MR. PATUR: May it please the Court, may I interpose a suggestion here? I believe that if Mr. Rosen would make an objection in proper legal form instead of giving us a speech every time he makes an objection, we could get along much faster here. He makes an objection and makes a speech.

"THE COURT: I am in complete accord with you, Mr. Patur, but I have resolved—I have resigned myself to let him make the speeches, and I will rule. I have indicated to him that I didn't think any speech is necessary, but it has been ineffective. There is nothing further that I can do. I appreciate your suggestion, but I am afraid I will just have to merely thank you for it and ignore it. * * * "

(SM 1975)

"MR. SELIGSON: * * * You have done everything you can so far in this trial to keep out testimony that would tend to establish the facts. You have objected at every turn to the introduction of any evidence whatever of personal dealings with Mr. Malakoff.

"MR. ROSEN: Your Honor, can I move to strike out that statement of Mr. Seligson as a commentary, your Honor?

"THE COURT: You may move. Do you so move?

"MR. ROSEN: Yes, sir.

"THE COURT: Your motion is denied. I feel exactly the same way. You are carrying water on two shoulders. * * *

"THE COURT: I have simply told you that I agree completely with the examiner's characterization of your talking through both sides of your mouth in the course of this hearing. You have done everything possible to keep out of the Court's view and hearing the transactions involved in and about that time. * * *

"MR. ROSEN: Your Honor, may I reply to Mr. Seligson's statement?

"THE COURT: No.

"MR. ROSEN: I have no right to defend myself after that statement?

"THE COURT: No, because I don't think you are entitled to any defense. That is a statement of fact of your attitude throughout this entire hearing. * * *

"MR. ROSEN: If your Honor please, I would like to make a motion.

"THE COURT: Make it.

"MR. ROSEN: Thank you sir. I respectfully request a mistrial—

"THE COURT: Denied.

"MR. ROSEN:—in this case. May I state my grounds, if your Honor please?

"THE COURT: Your motion is denied. Now you may state your grounds.

"MR. ROSEN: Thank you, Judge. On the ground of bias on the part of the examiner, amicus curiae of the court; on the ground that Mr. Robbins has been associated with the examiner and has been an adverse in this situation and has been buying up claims of the debtor—I call it raiding in order to purchase stock of the debtor and that his participation in this trial is biased.

"THE COURT: Any further grounds?

"MR. ROSEN: That is all at this time, Judge.

"THE COURT: Denied.

(SM 2161)

"MR. ROSEN: * * * I will have to reserve my right of cross-examination in order to examine all these records that were first produced today, which have John Malakoff's notations in them, which weren't produced previously pursuant to subpoena and also in order—

"THE COURT: Yes. I might at this point observe that all this delay I lay right at your doorstep. For four and a half years you have been counsel to this debtor and you didn't take the trouble to

examine a single one of these claimants and get all this stuff prepared; and for that reason I am wasting hours here.

"MR. ROSEN: If your Honor please

"THE COURT: Now you may make your statement on the record to justify what you did or didn't do.

"MR. ROSEN: Thank you, your Honor. I will try Judge. For four and a half years I have been in litigation in this case on one phase of it—

"THE COURT: Yes. I know, you have got your particular whipping boy. You aren't interested in anybody else.

"MR. ROSEN: Judge, can I, please? Do you mind please, Judge?

"THE COURT: Yes, go ahead, make your swan song here on how you have been abused for four and a half years. What have you been doing about arranging for this trial of these claims for four and a half years? * * *

"Have you examined a single stock claimant?

"MR. ROSEN: Yes.

"THE COURT: Who?

"MR. ROSEN: Quite a number.

"THE COURT: Who?

"MR. ROSEN: Oh, I would say I have examined about eight or ten or more. I have also gotten questionnaires. * * Your Honor, in order to save expense and cost, there were issues raised about expense, I prepared a questionnaire, under oath, Judge, which I sent out to all these stockholders except those that I examined because there was a serious criticism about the expense of the estate. I have got a questionnaire of every stockholder that sent it back under oath.

I was engaged in quite a bit of trials and motions, innumerable, in the four and a half years, together with questions of jurisdiction and everything else in this case. The time element in this case becomes practically prohibitive. I tried to effectuate compromises at open meetings, your Honor, and the net result was that it was humanly impossible to pre-

pare for trial and, after your Honor denied the compromises there was a short period of time, from that time—

"THE COURT: When did you bring on the motion for compromises?

"MR. ROSEN: Oh, that was brought on around—I don't recall now—four, five, six months ago.

"THE COURT: But you had four years before that.

"MR. ROSEN: But, Judge, during that time I got questionnaires to save money. Besides—

"THE COURT: You saved money in most of the instances but you confronted these claimants, whom you didn't properly prepare, with their questionnaires and pointed out that their testimony on the stand differs from what they said in the answers to questions in their questionnaire.

"MR. ROSEN: But, your Honor, I had at the beginning questions of jurisdiction, I had at the beginning questions, I imagine—

"THE COURT: If this case was too much for you, Mr. Rosen, you should have either gotten help or resigned. All I know is I am wasting hours here because of the fact that these claims were not properly prepared for trial."

(SM 2165)

"MR. ROSEN: All I would like to do is to try to get photostats, Judge and I will forget his [Pollak's] records, if you feel they shouldn't be examined.

"THE COURT: I don't feel anything. We have to do with what you have failed to do up until now. And now we will do it. * * * But I want you to know my displeasure at your utter lack of preparation.

"MR. ROSEN: But Judge, I should have a hearing to show you what I have done to prepare this case.

"THE COURT: In due course, Mr. Rosen, you will be required to show me what you have done.

"MR. ROSEN: Good, Judge. Naturally.

"THE COURT: All right, and I am telling you right now I am going to look at your production with a jaundiced eye.

"MR. ROSEN: Until that time, Judge,—I am trying the case—let us withhold criticism until you have seen—

"THE COURT: I will not withhold any criticism and I don't expect any gratuitous suggestions from you. * * You haven't done your job, and I am telling you it now, that the delay and the waste of time is due to the fact that these claims were not prepared properly.

"MR. ROSEN: Until you have taken the testimony and seen what was done in this case, and seen everything that was done in this case, I respectfully request that you withhold judgment.

"THE COURT: I am telling you that you have not properly prepared these claims.

"MR. ROSEN: That is not so, Judge.

"THE COURT: That is just a difference of opinion.

"MR. ROSEN: That is right, Judge. That is not true.

"THE COURT: I think the record will sustain my appraisal."

(SM 2305)

"THE COURT: I am sorry to interrupt here. If you think that I am going to go through each one of these things in this manner because Mr. Rosen neglected to conduct the proper pre-trial technique, you are very much mistaken, because I am not going to spend five years on this case. All of this should have been done, Mr. Rosen, before you came into Court. We will never get anywheres doing it this way.

"MR. ROSEN: May I respectfully state, after my compromise order was refused I even suggested in your chambers if I could—

"THE COURT: Mr. Rosen, I am at a loss to understand how you could even contemplate a compromise on claims that you apparently know so little about.

"MR. ROSEN: Can I answer that, Judge.

"THE COURT: Yes, I would love to know the answer.

"MR. ROSEN: I will, your Honor. I knew these claims very well, to this extent, Judge: to the people that had single transactions as against those people that had interrelated transactions, now those people that had isolated transactions, which their questionnaire under oath showed isolated transactions, those to me were rather simple to compromise.

"THE COURT: I agree with you. * * * In other words, what you are saying, if I clearly understand you, is that where you had a simple, isolated, clean, unincumbered purchase involving Nazareth, it was all very simple and therefore you had no problem as to those, and with that I agree with you completely. We have very little problem as to those, as to the trial of these stock claimants. But I cannot accept—I must accept, but I cannot say that the philosophy that where there was difficulty encountered in determining what the actual dollars and cents relationship was between Malakoff and the alleged stock claimants, that merely because difficulty was presented that you just arbitrarily guessed and put them in another percentage.

"MR. ROSEN: I wasn't guessing, Judge.

"THE COURT: I am satisfied as to one thing, Mr. Rosen—

"MR. ROSEN: Yes, sir.

"THE COURT: I am very well pleased with the fact that I did not grant your application to compromise.

"MR. ROSEN: That may be, Judge. I may at this stage of the game say to your Honor that I might well agree with you in view of developments."

(SM 3176)

"MR. ROSEN: If your Honor please, so that there may be no necessity for further postponements of the trial, I would kindly like advice from your Honor, or the examiner, whether they want all the other checks from the other witnesses that we are going to have on preceding transactions for the years,

that they had with John Malakoff, and I will so notify them by notice to produce or subpoena, because my original understanding was, except for the question of veracity, that if a deal was terminated by the time the Nazareth transaction came along, if the matters were terminated and there were no moneys due up and back, and no checks running into the transactions of Nazareth, or balances, that your Honor felt that that was not part of the pre-trial examination or possibly the trial. If it is necessary to have all those items then I say we should notify all claimants to produce them.

"MR. SELIGSON: I think all claimants should be treated alike. If they had dealings of this kind with Mr. Malakoff, then their records should be produced.

"MR. ROSEN: I gave you those checks. It wasn't a question of we were trying to treat anybody differently.

"MR. SELIGSON: You asked me what I wanted, what the examiner wanted, and I am telling you that all should be treated alike, and we shouldn't have Mr. Forman bring records and some other claimant not bring records, if he is similarly situated.

"MR. ROSEN: You mean if there were any past transactions prior to the Nazareth transaction, even though completely—

"MR. SELIGSON: That is right.

"THE COURT: I appreciate your dilemma, Mr. Rosen, but mine is equally confusing. I am not going to take a man's mere statement that, 'Yes, I had prior transactions.' I am not speaking about 1945 or 1937. I am speaking about within the area of time involved in Nazareth. I am just not going to take a man's plain statement, 'Oh, yes, I had a transaction but we squared that off before the Nazareth' and let it go at that because it may very well be we will find to the contrary.

"MR. ROSEN: All right."

(SM 3595)

"MR. SELIGSON: * * * It seems to me we ought to have transcripts of John Malakoff's bank accounts to tie in with these moneys that allegedly came to him from, not only this claimant, but from the other claimants. I should like the debtor, since the debtor has been taking care of subpoenas, although I will do it, if not done by the debtor, to get transcripts of the following accounts, accounts of John Malakoff, John Malakoff Agent and John Malakoff Special in what is now the Chemical Corn Exchange but which was then the Corn Exchange Bank Trust Company in the Grand Central branch. That is the branch with reference to which this witness testified. And this should run from January 1st, or rather, April 1, 1951, through August 31, 1953. And then precisely the same information from the New York Trust Company, Madison Avenue and 40th Street, and also from the Manufacturers Trust Company at 513 Fifth Avenue. * * *

"MR. ROSEN: I don't think that will be sufficient. I don't think that will be sufficient, if I understand your line of thought. I think that Mr. Malakoff might have had real estate accounts, and if there is—I understand what you are attempting to do is to try to tie in the moneys that Mr. Malakoff received, and where they went into each account, and how they were paid out from each account, depending, but the money reached Nazareth—then, I say, Mr. Seligson—

"THE COURT: Did you ever try to do it?

"MR. ROSEN: I couldn't. It was impossible.

"THE COURT: I say, did you try?

"MR. ROSEN: Yes. Here is what I did, your Honor—

"THE COURT: No, no, please. You have answered me, yes, you did. Then, don't you have transcripts?

"MR. ROSEN: It is impossible. I didn't try—

"THE COURT: You fight with witnesses because you don't get a responsive answer. I am telling you, you are little better than some of them. I asked you a simple question, 'Did you try to do it?' And you said 'Yes.' I simply said, 'Then, do you have transcripts of the accounts?'

"MR. ROSEN: I never got transcripts.

"THE COURT: Get them.

"MR. ROSEN: I can tell you why.

"THE COURT: I don't want you to tell me anything. The examiner wants to try an experiment. If he wants to compare the bank statements—

"MR. ROSEN: Without the checks, I respectfully suggest—

"THE COURT: You may be absolutely right, but I am not going to foreclose him from the right of making a comparison. If he wants to pick papers out of the ashcan and compare it, that is his business. * * *

"MR. ROSEN: I was going to—I wanted those statements, your Honor, if you will recall, to try to reconcile them with the checks.

"MR. SELIGSON: You want the statements too?

"MR. ROSEN: Definitely.

"MR. SELIGSON: Why don't you subpoena them, if you wanted them? You had all summer to do it, Mr. Rosen."

(SM 3843)

"Q [by Rosen] Mr. Weinstein, did you consider yourself a victim or did you use the word 'victim' because, after an investigation made by you, it appeared that John Malakoff did not put any money into the purchase of this business, took your money and everybody else's money—* * *

"THE COURT: Didn't put any money in the corporation, took everybody else's money and—go ahead.

"Q —didn't put any money into the corporation; promoted this particular transaction, using other people's money, as a venture, and pocketed the money or diverted it for other indebtedness or personal indebtedness? Is that the reason you consider yourself a victim?

"MR. SELIGSON: Have you finished?

"THE COURT: Do you object?

"MR. SELIGSON: Yes.

"THE COURT: Sustained. Step down.

"MR. SELIGSON: I was objecting; I wanted to find out in what capacity he was asking that question.

"MR. ROSEN: For the debtor."

(SM 3886)

"MR. SELIGSON: May I ask this: Are you suggesting that he [Manoochehrian] might have gotten back some of this 16,000 or whatever the money was, the 20 that he advanced through his brother? Is that what you suggest?

"MR. ROSEN: It is possible because he was in these deals with his brother. That is all I am involved in. I want to bring it out for the Court, your Honor. * * *

"THE COURT: We ought to have a subpoena. Mr. Rosen, don't misunderstand me. I am not telling you that you may not ultimately be entitled to inquire of him. All I am saying is that I doubt that I have the power to direct this man to bring in his brother's records. * * * I think you will have to serve a subpoena.

"MR. ROSEN: Can we leave that in abeyance to this extent—if the cross-examination then will develop any other factors leading up to that, why, then, I would have to have the brother with the records down here, not merely records.

"THE COURT: May I ask this question: I assume that this claimant was examined, his deposition was taken before trial?

"MR. ROSEN: Yes, sir.

"THE COURT: Was his brother's deposition taken as a witness?

"MR. ROSEN: No, your Honor.

"THE COURT: I will leave you to your own devices on it. All I can tell you is that I doubt that I have the au-

thority to make the direction that you request."

(SM 4564)

"Q [by Rosen] Well, would you [Gertrude S. Klein] kindly get a record from the bank or some evidence of cashing in bonds on or about January 21, 1952, for approximately $2300? Will you do that, madam?

"A Yes.

"THE COURT: Mr. Rosen, as trier of the facts, I am going to interrupt to ask you on what theory, logically, could Malakoff ever give this woman $2380 in order to get her check the same day for $2300? In other words, if he had $2380 in cash, what did he need her for? You see, you confuse me by this line of inquiry. It just doesn't jibe with human behavior. If the man had $2380 in his pocket, why would he come to Gertrude Klein and say, 'Here is $2380 in cash, deposit it in your account and give me a $2300 check'? And I would like to know on what theory—I mean, it just doesn't appear to be logical human behavior.

"MR. ROSEN: I can only say that there were many transactions with Malakoff, exchange checks, various checks were given—

"THE COURT: Just a minute. I didn't see the photostatic copy of the deposit slip which was exhibited to this witness, but apparently that deposit slip manifests a cash deposit on that day. Now, that is far cry from his coming to her and saying, 'Here is my check for $2300; give me your check for $2300.' In other words, pure kiting. But your theory is here that he came to the woman and he gave her $2380 in cash and got her check for $2300. Now, if that is not—

"MR. ROSEN: No, that is not my theory, your Honor. My theory might be that he gave her post-dated—

"THE COURT: I don't want to know what your theory might be; I want to know what your theory is. Your question so far addressed to this lady indicates what I have said, i. e., that she got $2380 in cash from Malakoff and deposited it, and you produce, which I haven't seen, the deposit slip showing that that was a post-dated check; that wasn't a check at all; it was a cash deposit. On what theory would Malakoff come to this woman and say 'Here is $2380 in cash; give me your check for $2300'? It just doesn't make sense.

"MR. ROSEN: That is true, except on the ground of veracity. It is the source of the $2300, your Honor.

"THE COURT: The woman has testified that she cashed bonds. Now if there were any merit to your position, if the source of that $2380 deposit was Malakoff I feel that her veracity should be sustained by some proof of the cashing of the bonds. What I am trying to point out to you is that your whole basis is so illogical that I am not, unless you give me a better reason, I am not going to have this woman running around trying to get records of a six-year-old transaction at a bank involving the cashing of Government Bonds.

"MR. ROSEN: Your Honor, your logic is absolutely correct.

"THE COURT: Well, thank you.

"MR. ROSEN: And I withdraw my request. It is absolutely correct."

(SM 5031)

"Q Mr. Katzenell, on this deposit slip is that Belleville or Bergenline? Look at this carefully.

"MR. ROSEN: If your Honor please, that is exactly what I meant on my objection.

"THE COURT: Overruled. If you think I am going to allow an error to remain in this record and let you take advantage of it, you are very much mistaken, and you have a very warped idea of the function of the Court. I happen to have seen that slip too, although it is not in evidence, when I asked about the deposit slip, and if you want this record to remain unchallenged when there are inaccuracies in it, Mr. Rosen, I don't; that is not my function, and as an ad-

vocate I want to advise you, sir, that it is not yours, either."

(SM 5104)

"MR. ROSEN: I have no objection to this check.

(Marked Claimant Katzenell Exhibit 51 in evidence).

"MR. ROSEN: If your Honor pleases, my mind is as difficult as a lady's. Can I change my mind and object to it?

"THE COURT: You may, and your objection is overruled."

(SM 5268)

"MR. ROSEN: If your Honor pleases, may I object on the ground that he is directly impeaching the testimony of his own witness.

"THE COURT: Overruled. Let us get the truth. This witness had a labyrinth of deals with this man. You expect him to remember everything? So, if he makes a mistake, I am going to let it be corrected. I am not going to let lies or errors remain in this record. You make your objections and I will overrule them.

"MR. ROSEN: I merely have a right to object—

"THE COURT: You have a right, and I have a right to tell you I think you are wasting time. Go ahead."

(SM 6788)

"A. These are the only records that I have.

"MR. ROBBINS: Your Honor, I just want to note for the record that these records have been produced. They have not been received in evidence.

"MR. ROSEN: I would like to offer them, if your Honor please.

"MR. ROBBINS: Wait a minute. There is a good deal of duplication here.

"THE COURT: Mr. Rosen, have you examined them, those records?

"MR. ROSEN: These particular records?

"THE COURT: Yes.

"MR. ROSEN: No, your Honor. I didn't know which she had. I think they were merely marked.

"THE COURT: You are offering them in evidence without even having looked at them?

"MR. ROSEN: Yes, your Honor.

"THE COURT: That is a fine way to try a lawsuit.

"MR. ROSEN: I believe I know the total, Judge."

## APPENDIX B.

On February 28, 1955 Rosen filed a proof of claim for $3,750 representing fees earned but unpaid for services rendered to the debtor prior to the filing of the Chapter X petition.

On March 25 and 27, 1959 Rosen testified in support of his claim for $3,750.

(SM 6829)

"I would sometimes enter an entry in a diary and then immediately it would be entered on a card system, or sometimes I would give a little memo to my secretary who would enter it in a card system, or sometimes I would just walk over to her and say, 'I spent this amount of time,' and she would enter it in a card system.

"I have a card index, your Honor, which was prepared way back in 1953 and which I would like to offer in evidence. It was kept under my supervision covering the period of time referred to in Claimant Alex Rosen's Exhibit 2. [Rosen's bill to debtor September 24, 1953]

"MR. SELIGSON: What is that period?

"THE WITNESS: That covers 7/13/53 to 8/31/53. But the card index runs beyond 8/31/53, your Honor. I have other card index for the subsequent period, your Honor."

(SM 6856)

"A. No, I explained to you, Mr. Robbins, that I have a smaller office, as I say; I am not a large office, and I would have three methods. Sometimes, frankly, I don't remember to tell my secretary, and we have no notation. It is done through the diary; it is done by

a little memo, and sometimes I just tell my secretary, and she just takes the card right there and puts it on.

"I would say I would be more apt, Mr. Robbins—and I state under oath—to leave out work and time that was consumed than to put it in."

(SM 6858)

" * * * I have not added up the number of hours. As a matter of fact, my office is not capable of keeping so exact a record to itemize all the hours every time it happens, and that is why I frankly say that I would be more apt not to have the amount of time that I spent on a case and the expense than the amount of time I do spend."

* * * * * *

"But unfortunately in the stress of labor and the stress of time and work it is impossible to keep an absolute completely detailed record of hours and times. Sometimes I would tell the girl 'Here, I have spent two hours today or three hours today.'

"Another time it will merely appear that I have been in court.

"Now, actually I might have been in court six hours and the record will show I have been in court.

"When I do think of it and I am not extremely busy taking care of my business, Mr. Robbins, I tell my secretary or leave a memo of the exact time. When I am extremely busy it is almost physically impossible to do so."

(SM 7013)

"Q [By the Court] * * * Now, your cards, you have testified, are your original records.

"A [By Rosen] Yes, your Honor."

No mention was here made of any ledger maintained regularly by Rosen at his home nor were cards for the subsequent period, whatever it was, offered in support of the claim for an allowance. (See SM 15199, quoted infra)

At the hearings held in October, 1965 on the instant application for allowance, Rosen testified for the first time on cross-examination, that his time records in connection with the reorganization had been stolen shortly after he had completed using them in preparing his application for allowance.

(SM 14837)

"A * * * There was stolen a machine which I used on my legal work, a dictating machine was stolen, of the value of about $100; an umbrella was stolen; my briefcase with my dockets was stolen in which I had included not only the Nazareth matters but about ten, twelve other matters, including Surrogates' Court proceedings.

"I offered a reward. It was because I wanted the book more than anything else.

"Now, the Police Department was notified in that precinct. They have a record of it. So far they have not been able to find it."

(SM 15199)

"BY THE COURT:

* * * * * *

"A I had a ledger home in which I kept all Surrogate Court proceedings, bankruptcy proceedings; I had about 10 or 12 matters in that, and when I would come home, whether it was the same day or two days later, or a day later, I would make an entry there. I started that many years ago, your Honor.

"Q That was a book?

"A Yes, your Honor.

"Q Do you recall testifying in this court for an allowance for matters that you performed for this bankrupt or for this debtor?

"A Yes, your Honor.

"Q At that time you produced certain records. Do you recall that?

"A Yes, your Honor.

"Q They were typewritten cards, were they not?

"A That is right, your Honor.

"Q Am I to understand that they were kept differently from this book that you speak of?

"A Yes, I kept cards and a book, because what would happen would be this,

your Honor: when I would come home at night I would try to remember what I did that day or the day before; I would make an entry in the book and I would advise the girl. And then I found out that that was much too cumbersome, because we both got so busy, your Honor, so terribly busy, that I have started to make entries merely in the book."

The court, *sua sponte*, reopened the hearings on Rosen's application for an allowance on October 26, 1965. On that day, Detective Russell McVeigh, to whom Mr. Rosen reported the alleged theft of his time records testified on cross-examination by Mr. Rosen as follows:

(SM 15333)

"Q  Just one moment please. Could you possibly try and refresh your recollection if in the course of the conversation when I spoke to you I said something that there was a book with the records that I kept, or some records that I kept?

"A  When I spoke to you, Mr. Rosen, there was no mention of a briefcase, but there was mention of papers and notes. I don't recall it being in book form. It is possible you might have said that, but I know you said papers and notes that were of value to you but valueless to anybody else.

"MR. ROSEN:  Thank you.
BY THE COURT:

"Q  You are sure, sir, that there was no reference to a briefcase?

"A  There was no mention of a briefcase, your Honor."

The official report made by the police of the alleged theft reported by Rosen made no mention of a briefcase or ledger, or any books or records. (Court Ex. #1, October 26, 1965)

Although the hearing was kept open to permit Rosen to adduce additional proof of his offer of a reward for the recovery of his briefcase containing his docket, Rosen never availed himself of that opportunity.